In re Jeri Lyn LEE, Debtor.

Jeri Lyn Lee, Plaintiff,

v.

Regions Bank and Student Loan Guarantee Foundation of Arkansas, Defendants.

Bankruptcy No. 1:03–bk–74063.
Adversary No. 1:05–ap–07103.

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

July 6, 2006.

**913**

Teresa M. Wineland, Shackleford Law Firm, El Dorado, AR, for Debtor.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

Before the Court is a complaint to determine the dischargeability of a student loan debt that Jeri Lyn Lee ("Debtor") owes to Regions Bank and the Student Loan Guarantee Foundation of Arkansas ("SLGF"). In the complaint, the Debtor alleges that excepting the debt from discharge will impose an undue hardship on the Debtor and her dependents. SLGF answered the complaint and after a trial on the merits on February 21, 2006, the Court took the matter under advisement.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### FACTS

The Debtor, 31 years of age, lives in El Dorado, Arkansas. She is divorced and the custodial parent of two children, ages eleven and six. From 1992 to 2001, the Debtor attended college and obtained a bachelor's degree in Business Administration with a major in finance from Southern Arkansas University. Her college education was financed with student loans, the dischargeability of which is the issue in this proceeding. The student loans the Debtor seeks to discharge total $47,612.11.

During her college career, the Debtor was on academic probation for several semesters, and her overall grade point average was approximately a 2.0 on a 4.0 scale. At the hearing, she accounted for her lackluster academic record by stating that her youngest son, born in 1999, was ill and had to be hospitalized, a circumstance that caused her to miss classes and perform poorly.

After she graduated in May 2001, the Debtor was divorced from her first husband in June 2002. On June 17, 2003, she filed for bankruptcy protection under chapter 7. Her statement of Financial Affairs shows that she grossed $23,000.00 in 2001 and $26,000.00 in 2002. Her Schedule I demonstrates that at the time of bankruptcy filing, she netted $1336.80 a month in income working as an accounting clerk, a position she had held for two years. Her gross hourly wage was $10.50 an hour for a 40–hour week. Schedule I also shows that she received child support of $366.87 a month.

In 2004, the Debtor remarried, but that marriage also ended in divorce at a time not stated in the record. Also in 2004, she became unemployed and remained so for much of the year. Her income tax return for 2004 demonstrates she received $11,240.00 in income, mostly from unemployment.

The Debtor received her discharge on September 25, 2003, and the case was closed May 3, 2005, but reopened on June 24, 2005, in order to file this adversary

proceeding. Six months prior to the hearing date, the Debtor obtained a job in the admissions department at the Medical Center of South Arkansas. She earns $9.00 an hour for a 32–hour work week or a gross monthly income of $1152.00. She testified that she continues to search for other work in her field but has been unsuccessful thus far.

She testified that her former spouse, the father of the two children, was not paying child support as of the date of the hearing and that he is currently unemployed although looking for work. She stated that about a year before the hearing, she attempted to collect child support by having the children's father arrested, at which point he borrowed money from a family member to pay some portion of the support arrearage. In her testimony, she implied that at the present time she has no money to pay legal fees to pursue collection. Furthermore, she believes it would be futile to pursue collection in view of the fact that her former spouse lives with his family, is not working, and may not be able to borrow any more money from relatives.

When the Debtor filed her petition in bankruptcy under the provisions of Chapter 7 in 2003, she owned a home that was later destroyed by fire. All contents in the home were also destroyed. With insurance proceeds, she paid the indebtedness on the home and replaced some of the personal property that was lost. She now rents a residence for a sum that is greater than her previous monthly mortgage payment.

The Debtor testified that her monthly fixed expenditures for herself and her family exceed her income. They include the following expenses:

| | |
|---|---:|
| Rent | $ 400.00 |
| Electricity | 150.00 |
| Water | 25.00 |
| Cable Television | 46.00 |
| Telephone | 75.00 |
| Car maintenance and fuel | 100.00 |
| Food | 350.00 |
| Clothing | 100.00 |
| Children's Sports | 20.00 |
| Medication | 30.00 |
| Health Insurance | 70.00 |
| Total | $1366.00 |

The Debtor does not own a vehicle but has use of a 1997 automobile belonging to her parents. She stated that she foresees having to replace the vehicle soon, in which case she will bear the additional expense of a car payment and insurance.

Although the Debtor's employer provides a health insurance plan, she has chosen not to insure her children through the plan because to do so would cost an additional $100.00 a month. Despite being covered by health insurance herself, the Debtor stated that in the near future, she will have to pay a $400.00 deductible fee for a surgical procedure she is scheduled to undergo.

The Debtor testified that her parents and her grandmother live in the El Dorado area and help care for her two children. This is particularly beneficial to her not only because she is saved any childcare expense but also because she sometimes works on weekends when typical daycare services are unavailable.

SLGF introduced evidence at the hearing that the Debtor is eligible for a loan consolidation program offering an interest rate of 5.5% and a variety of repayment plans. Under the Standard Repayment plan, her monthly payment would be $516.73 for a term of 120 months. The Extended Repayment would require a monthly payment of $292.39 for a term of 300 months, and the Graduated Repayment would be $258.36 to gradually increase over 300 months.

The Income Contingent plan would require a payment of $13.03 for a maximum of 300 months. (Def.'s Ex. 2.) Under the

Income Contingent plan, the Debtor would be required to pay an amount that would fluctuate from year to year based on her ability to pay. If the Debtor pays under this plan for a maximum of 25 years, any debt remaining will be forgiven. The Debtor testified that she was unaware of the availability of the Income Contingent plan until the day of the trial.

Of the total unsecured debt of $62,000.00 listed on the Debtor's schedules, approximately 76% is related to student loans. The Debtor has never made a payment on her student loans. At various times since the loans became due, she has asked for and been granted forbearance.

## DISCUSSION

The Bankruptcy Code provides that

A discharge under section 727 ... does not discharge an individual debtor from any debt—

(8) for an education benefit overpayment or loan ... guaranteed by a governmental unit ... unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents ...

11 U.S.C. § 523(a)(8) (2000).

■ A debtor seeking discharge of an educational loan debt guaranteed by a governmental unit has the burden of proving by a preponderance of the evidence that the debt will impose an undue hardship. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 292 B.R. 635, 638 (8th Cir. BAP 2003)(citing *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock)*, 45 F.3d 363 (10th Cir.1995); *Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981); *Standfuss v. U.S. Dept. of Educ. (In re Standfuss)*, 245 B.R. 356, 359 (Bankr.E.D.Mo. 2000); *Kopf v. U.S. Dept. of Educ. (In re Kopf)*, 245 B.R. 731, 734 (Bankr.D.Me. 2000) (citing *Grogan v. Garner*, 498 U.S.

279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Clark v. United Student Aid Funds, Inc.*, 240 B.R. 758, 761 (Bankr. W.D.Mo.1999))).

■ In the Eighth Circuit, the test for undue hardship is a three-pronged analysis of the totality of circumstances unique to the particular bankruptcy case. The focus is on the debtor's past, current and reasonably reliable future financial resources; the reasonable necessary living expenses of the debtor and the debtor's dependents; and any other relevant facts and circumstances in the bankruptcy case. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.2003) (citing *In re Andrews*, 661 F.2d at 704; *Andresen v. Nebraska Student Loan Program (In re Andresen)*, 232 B.R. 127, 132 (8th Cir. BAP 1999)).

■ Under the totality of the circumstances test, the court must determine whether the debtor's future income will enable the debtor to make some payment on the student loan while still maintaining a minimal standard of living. *Albee v. U.S. Dept. of Educ. (In re Albee)*, 338 B.R. 407, 410 (Bankr.W.D.Mo.2006) (quoting *In re Long*, 322 F.3d at 554). A minimal standard of living does not mean the debtor must live in abject poverty. *Bray v. Educ. Credit Mgmt. Corp. (In re Bray)*, 332 B.R. 186, 192 (Bankr.W.D.Mo.2005)(citing *Educ. Credit Mgmt. Corp. v. Stanley (In re Stanley)*, 300 B.R. 813, 818 (N.D.Fla.2003)).

■ Under the Eighth Circuit test for undue hardship, the initial inquiry is to examine the Debtor's past, present and reasonably reliable future financial resources. In the past, she has earned a gross hourly wage of approximately $10.50 by working full time as an accounting clerk in El Dorado, although now she only earns

the gross hourly rate of $9.00 for a 32–hour workweek.

This figure calculates to $1132.00 a month, minus taxes and other required withholding in an amount not stated in the record.

In the past, she received $366.87 a month in child support payments, according to her bankruptcy schedules, and has also been awarded some child support arrearage through court enforcement. However, her former husband has been unemployed for more than a year and is not currently paying child support.

In summary, when the Debtor filed for bankruptcy in 2003, her financial resources were greater than they are now. Despite receiving a discharge of some of her debts, her financial condition has deteriorated since the bankruptcy filing. She was unemployed for a significant period in 2004 and 2005 and has since been unable to find full time employment. Though not by choice, she now earns a lower hourly wage, works only part time, does not receive child support, and has lost her only asset, her home, to fire.

From a review of the Debtor's past and present financial resources, as well as other factors, the Court concludes that it is unrealistic to expect a substantial increase in her future financial resources. She has never earned more than $10.50 an hour and is earning even less per hour now. Her degree, academic record, and job experience support the inference that she will continue to be employed in the typically low-paying clerical field. A degree in finance with an unimpressive academic record simply does not portend a lucrative job in the future.

Moreover, the Debtor lacks the means to cover the expensive childcare costs that are necessary expenditures for single working mothers with school-age children.

While she is fortunate to have family members to shoulder part of the childcare responsibilities, that familial support is available to her because she continues to reside in the small town of El Dorado where her family lives. Therefore, she is tethered by family support to a small-town job market with presumably fewer job opportunities than are typical of a larger city. Her limited job opportunities are likely to persist at least until her youngest son, who is six years old, no longer requires childcare and she can seek employment elsewhere. Even then, the Court recognizes that in this case the advantages to her children of small town living with a supportive family in close proximity may outweigh the greater career opportunities afforded by a metropolitan area.

With regard to future support from the Debtor's former spouse, the Court concludes that he cannot be relied upon to shoulder his share of the costs of raising the two children. His unemployed status has persisted for more than a year, an indication that he could remain jobless for the foreseeable future. *See, e.g., Brown v. USA Group Loan Servs. (In re Brown)*, 234 B.R. 104, 108 (Bankr.W.D.Mo.1999) (stating that, based on history of nonpayment of support, non custodial fathers of debtor's three children were unlikely to pay child support in the future). It may be reasonable to suppose that at some point in the future, the former spouse will find employment and begin to pay child support. But when he will find work and how much support he will be able to supply are impossible to predict. *See Balm v. Salliemae Serv. Corp. (In re Balm)*, 333 B.R. 443, 449 (Bankr.N.D.Iowa 2005) (refusing to consider any potential child support income for debtor's daughter as a future financial resource because to do so would be speculative and support funds were arguably for child's needs, not student loan payments).

The Court is also required to examine the Debtor's reasonable necessary living expenses. With the possible exception of $46.00 a month for cable television and $20.00 for the children's sports activities, the Debtor's list of living expenses consists entirely of payments for necessities. Her standard of living is minimal, at best. Even after eliminating expenditures for cable television and sports activities from this bare-bones budget, the Debtor's expenses exceed her income by $148.00 every month. Additionally, she testified that at some point in the near future, she will have to replace the borrowed nine-year-old automobile she drives. Also, in the near future the Debtor will have to pay $400.00 out of pocket for a scheduled surgical procedure.

Because the Debtor's reasonable expenses greatly exceed her income, she does not have the present ability to make a student loan payment, even the minimal amount of $13.03 a month under the Income Contingent Plan. Furthermore, the Debtor's budget deficit is likely to grow in the near future when she is required to pay a $400.00 medical bill and to buy an automobile after her nine-year-old car is no longer serviceable. Some form of transportation is a necessity if she is to continue commuting to and from work and to destinations related to her children's needs. Additionally, her budget does not allow for contingent expenses related to health care for her children.

The Court finds that even if the Debtor begins to receive child support and acquires a full time job in her field, it is unlikely that she will be able to make ends meet in the foreseeable future. Her earnings history supports the inference that she will be relegated to low-paying jobs for years to come. Any increases in income in the short term will more than likely be absorbed by her current budget shortfall and the added automobile expense. In the long term, there is the strong possibility that in a household including two growing boys, continually increasing expenses for necessities such as food, clothing and medical care will offset any increases in salary.

SLGF argues that the availability of the Income Contingent Plan dispenses with the need for courts to consider the debtor's future resources because "if the debtor does not have the money to pay they will not be required to pay." (Def.'s Post–Trial Brief.) This Court is unaware of any Eighth Circuit Court of Appeals ruling specifically directing the bankruptcy court to forego an inquiry into the debtor's reasonably reliable future financial resources when the Income Contingent Plan is available to the debtor. Moreover, it may not be entirely accurate to state that the Income Contingent Plan requires a loan payment only when the debtor is able to pay. In the instant case, the Debtor does not currently have the sum of $13.03 a month left after paying for necessities. But SLGF's evidence is that the Income Contingent Plan will require the Debtor to pay that amount every month based on her current income and family size.

Under the totality of the circumstances analysis, the SLGF urges the Court to consider the following circumstances not previously addressed: the Debtor is not incapacitated or disabled, the indebtedness is approximately 76% of the Debtor's total unsecured debt, she has not consolidated her loans to reduce her payments, and she has never made a payment on the loans.

Indeed, the Debtor is young, healthy, and able to work. But those circumstances do not outweigh the economic negatives of being a single mother who is solely supporting her two minor children by working at a low-paying job that does not provide adequately for basic family needs.

■ Furthermore, the Court draws no negative inference from the fact that the Debtor has not previously consolidated her loans to reduce her payments or that she has not made a payment on her loans. From the record before the Court, it appears the Debtor graduated in May 2001 and payments on the loans would not have been due until at least six months thereafter. Some six or seven months later, she and her first husband were divorced in June 2002. The Court infers from the timing of the occurrence of the divorce that her financial difficulties stemmed from marital difficulties that necessitated the Debtor's establishing a separate household. This circumstance precipitated her slide into bankruptcy.

The Debtor filed for relief under the provisions of Chapter 7 in June of 2003 and an examination of her schedules reveals that her monthly expenses exceeded her income without factoring in the expense of a student loan payment of any kind, consolidated or otherwise. Except for a period of two months, her bankruptcy has been ongoing since June 2003.

In short, this is not a case where the Debtor enjoyed a prosperous period when her college education resulted in a job where she could afford to make a student loan payment but where she chose to defer payments instead. During the approximately 19 months between the time the loans were due and the filing of the bankruptcy, her financial condition was deteriorating. To this financially-strapped Debtor, reducing the payment through consolidation would have been pointless.

These same extenuating circumstances reduce any weight the Court might otherwise give to the fact that the Debtor has never made a student loan payment. Additionally, the Debtor testified that she was unaware until the day of trial that the SLGF offered an Income Contingent Re-

payment plan. The Court will not fault the Debtor for failure to restructure her student loans when she was never advised of the various possibilities available to her. See Cheney v. Educ. Credit Mgmt. Corp. (In re Cheney), 280 B.R. 648, 666 (N.D.Iowa 2002) (stating that repayment plan is "no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship if the creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them").

■ Similarly, the Court does not apportion much weight to the fact that the student loan obligation accounts for 76% of the Debtor's total unsecured debt. To be sure, when a debtor attempts to discharge debts that are principally student loans, a court can infer that discharging the student loans was the dominant purpose of the bankruptcy filing, as SLGF argues. However, here there are no facts in the record to suggest that the Debtor funded her college education with student loans with the express intent to discharge them later in bankruptcy.

As stated previously, the Debtor's slide into bankruptcy was precipitated by divorce and the financial burden of funding a separate household for herself and her children. In this case, the fresh start she might have anticipated from her discharge has been marred by misfortunes subsequent to the bankruptcy filing that were beyond her control: a second divorce, job loss, fire loss, and inability to collect child support. The record establishes that only after all these misfortunes occurred did the Debtor seek to discharge her student loans in bankruptcy.

In conclusion, the Debtor's current financial condition is dire, and she cannot pay any student loan payment, even $13.03 a month. The foreseeable future does not

promise a change in her circumstances to the extent that she will be able to make a payment on her student loans without causing an undue hardship on herself and her dependents. For these reasons, the Court determines that the student loan indebtedness at issue is dischargeable.

IT IS SO ORDERED.