**In re Stephen Lee HALVERSON, Debtor.**

**Stephen Lee Halverson, Plaintiff,**

**v.**

**U.S. Department of Education, American Education Services, University of Minnesota, Wells Fargo Educational Financial Svcs, "USEFG, ELT BONY T IV," and Educational Credit Management Corporation, Defendants.**

**Bankruptcy No. 07–42034.**
**Adversary No. 08–4123.**

United States Bankruptcy Court, D. Minnesota.

Feb. 12, 2009.

---

Brian F. Kidwell, Burnsville, MN, for Plaintiff.

Brian J. Slovut, Associate General Counsel, Henry T. Wang, Gary Plant Mooty Mooty & Bennett PA, Minneapolis, MN,

## MEMORANDUM OPINION

ROBERT J. KRESSEL, Bankruptcy Judge.

This adversary proceeding came on for trial on January 6, 2009 on the debtor's complaint seeking a determination that his student loans are dischargeable pursuant to 11 U.S.C. § 523(a)(8). Brian F. Kidwell appeared for the plaintiff. A.L. Brown and Henry T. Wang appeared for defendant Educational Credit Management Corporation.[1] This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

Stephen Lee Halverson was born October 17, 1943, and is sixty-five years old. He is an educator who has devoted most of the last thirty years to the instruction of young people in the areas of art, special education, and vocational education and as a substitute teacher. In 1963, Halverson enrolled at the University of Minnesota with the goal of becoming a teacher. He attended the U from 1963 to 1967, earning a bachelor's degree in art education but incurring no student loans. Halverson began teaching art at Washburn High School in Minneapolis in 1967. While working at Washburn, Halverson's dedication to teaching led him to pursue his master's degree in art education, again without student loans.

In 1976, Halverson's first son was born. A year later, he was laid off from his job with the Minneapolis public schools, even though he had been tenured and had worked there for almost ten years. Although he continued to look for work as a teacher, Halverson was unsuccessful and took a job as a grain handler for General

---

1. Although the complaint named six defendants, only two answered (ECMC and the University of Minnesota). The other four are in default. ECMC was substituted for defendant American Education Services. Prior to trial, the plaintiff and the University of Minnesota reached a settlement.

Mills. The job paid better than teaching and he worked there from 1978 to 1980, when he had a serious accident at work. He underwent four surgeries for severe injuries sustained in the accident and received workers' compensation. In 1982, Halverson received a rehabilitation grant to take courses at the Minneapolis School of Communication Arts, receiving a certificate. He then worked as a self-employed media producer until 1984. In 1985, he returned to the classroom, teaching at Lakeville High School full-time under a long-term temporary contract.

The same year that Halverson returned to the classroom, his seventeen-year marriage ended in divorce. The custody dispute with his wife lasted three years and he was eventually awarded custody of their son. His former wife left the state. He and his wife had owned a home, and when it was sold, he rolled his portion of the proceeds into the purchase of a new home. In 1987, his second son was born. In 1989, the mother of the young child died in a household accident, leaving Halverson with sole custody of two boys. That same year, he lost his home in foreclosure. His younger son had developmental delays that were evident by his first birthday and he was later diagnosed with attention deficit disorder and bipolar disorder. In spite of the challenges, Halverson devoted himself to the care of his sons.

While caring for his sons as a single dad, Halverson worked part-time at the University of Minnesota as a research associate and attended the university part-time, earning master's degrees in special education and vocational education. The special education degree required significant doctoral coursework. He pursued the degrees from 1988 to 1994, and borrowed approximately $132,000.00 to finance his education.

In 1995, Halverson's older son was nineteen and his younger son with special needs was eight years old. Halverson took a full-time teaching position in the Twin Cities public schools. Unfortunately, the program was eliminated in 1996. That same year, he found a new position teaching emotionally and behaviorally disordered middle school students in the Minneapolis public schools. Because he had been previously tenured, the district had to either give him tenure or terminate him after one year in a new teaching job. In 1997, the school district chose to terminate his employment.

Halverson's father had a stroke and passed away sometime in the middle to late nineties, and the demands placed on Halverson by his family grew. Halverson and his sons moved in with his mother to care for her. His mother was losing her sight, could not drive, and had age-related health issues. He did most of her driving, including taking her to her appointments and doing her grocery shopping. Although his mother and his son with special needs made competing demands on his time, he continued to help them both. Even with such serious and time-consuming family obligations, he took a couple of other full-time positions with the Minneapolis public schools between 1997 and 2001.

Halverson's older son moved out in 2001, but Halverson continued to care for his younger son, who was prone to outbursts of anger when not taking his medication. From 2002 to present, he has continued to care for his mother, who is now ninety-two. Since 2002, Halverson has also worked as a substitute teacher for the St. Paul public schools on an as-needed basis. Because he rarely turns down an opportunity to teach, "as-needed" has essentially meant full-time work without any benefits or regular hours. He earns only $13.50 an hour,

despite his academic credentials and many years of experience. He works as a substitute because, in spite of his efforts, he has not been able to get a full-time teaching job.

Throughout Halverson's life, he has faced some health limitations, although they have not stopped him from being a dutiful father, son or teacher. Generally, the limitations have not impeded his employment, but they do account for gaps in his employment history. In addition to the injuries he sustained in his on-the-job accident at General Mills, he has struggled throughout his life with attention-deficit/hyperactivity disorder, which went undiagnosed and untreated until 1996. He has also suffered from life-threatening sleep apnea, hypertension, painful bone spurs, panic disorder, and Type II diabetes. He has undergone surgeries to repair a hernia and a rotator cuff. He hopes to continue substitute teaching for another five years, but given the obvious health limitations he already faces at age sixty-five, that seems very optimistic.

Recently, Halverson fell in love with Mary Wolter, a friend of the family he had first met at church in 1962. In 2001, Wolter's husband of thirty-six years died suddenly. In 2002, Halverson and Wolter reunited at church. In 2007, they started dating and eventually decided to marry. They signed an antenuptial agreement and then married in 2007. After they married, he moved out of his mother's home and into Wolter's. Wolter is economically self-sufficient due to the good planning and thrift exercised during her first marriage. She supports herself with her first husband's pension, Social Security benefits, and their joint savings. From this income, she follows the Bible's dictate to tithe by donating ten percent of her income to her church. Her house was purchased with her first husband. Wolter has adult children. The marriage has already been challenging, due to Halverson's ADHD, time management issues and his family obligations, including his younger son's behavioral issues. However, the greatest strain on the marriage has been his student loans.

ECMC holds two of Halverson's student loans. Both are consolidation loans. On December 29, 2008, the total balance of the loans was $295,182.48. The first consolidation loan was for $9,204.04, disbursed on February 9, 2005. It has an interest rate of 8.25%, accruing at a rate of $2.48 per day. The balance as of December 29, 2008 was $11,363.29. The second consolidation loan was for $213,850.62, disbursed on April 13, 2005. It has an interest rate of 8.25%, accruing at a rate of $62.05 per day. The balance as of December 29, 2008 was $283,819.19. Halverson is eligible for the Ford Program's Income Contingent Repayment Plan. Under the ICRP, Halverson's monthly payment would be $534.80 based on his and his wife's combined 2007 adjusted gross income of $46,088.00 and a family size of two. The parties agree that without the ICRP, Halverson's monthly payment would be higher, although neither party presented any evidence of the current contractual payments. The parties stipulated that ECMC's loans accrue monthly interest of $1,962.79, and annual interest of $23,553.40, so I assume that the contractual payment would exceed $2000.00 per month. If Halverson elected to participate in the ICRP, he would pay for twenty-five years, and then any remaining balance would be forgiven and assessed for taxes as income. He would be ninety years old.

Wolter has suffered physical manifestations of the stress from Halverson's enormous student loan debt, including having jaw problems from grinding her teeth. The couple has been in pastoral counseling

for their problems. If his loans are not discharged, it will increase the stress on him, Wolter, and the marriage, at least in part because it will necessarily decrease his contribution to their monthly expenses and hang over their heads like the Sword of Damocles.

Halverson lacks a basic grasp of his own finances. He has never even balanced his checkbook. He has paid over $26,000.00 on his student loans altogether, although ECMC has not received any payments on the current consolidation loans, which have been in a hardship deferment. He is not currently, nor has he ever been, in default on his student loans. When he has been unable to make payments, he has always sought and received hardship deferments. He did not grasp the effect of deferment on the accrual of interest. He was shocked to learn how much he owed in interest on his student loans.

Halverson and Wolter's finances have remained separate by mutual desire and design. They split household expenses equally, except that she had been paying for his medical insurance until he got on Medicare. They hold separate bank accounts at different banks. Halverson's name does not appear on Wolter's bank records and Wolter's name does not appear on Halverson's. Wolter never intended to assume Halverson's student loan liability.

Wolter and Halverson's incomes consist of earnings, pensions and Social Security. She worked as a receptionist before her first marriage, and worked outside the home sporadically during that marriage. Currently, health problems limit her employment options. Her monthly after-tax income consists of approximately $80.00 from part-time employment, $1,258.00 from Social Security, and $1,251.81 from a pension for a total of $2589.81. His monthly after-tax income consists of approximately $1,225.00 from employment as a substitute teacher, $418.00 from Social Security and $451.17 from a pension, for a total of $2094.17.

Halverson and Wolter's monthly expenses consist of: [2]

| | |
|---|---|
| Electric and gas | $137.00 |
| Water and sewer | 20.00 |
| Garbage | 21.00 |
| Phones | 72.00 |
| Internet | 12.00 |
| Groceries | 375.00 |
| Restaurants | 50.00 |
| Gas, car maintenance | 200.00 |
| Lawn-care, shoveling [3] | 100.00 |
| Home maintenance, repairs | 150.00 |
| Travel | 27.77 |

Their household expenses total $1164.77 not including tithing. Halverson's medical and dental benefits had cost $1,851.59 per month before he began participating in Medicare. He currently is on Medicare, and his current medical expenses include:

| | |
|---|---|
| Medicare premium | $640.00 |
| Medigap Freedom Plan insurance premium | 247.50 |
| Parts A and B (deducted from Social Security) | 96.40 |
| Dental premium | 167.50 |

In sum, Halverson's personal healthcare expenses total at least $1151.40 plus out-of-pocket healthcare expenses. Wolter's additional expenses include health insurance premiums, out-of-pocket expenses and retirement contributions:

**2.** The parties did not stipulate to Halverson's expenses which is normally done. ECMC objected to Halverson's attempt to introduce a summary exhibit of his expenses. I was able to glean them from the record.

**3.** Lawn-care and snow removal cannot be performed by Halverson or Wolter because of their physical limitations.

| Healthcare Premiums | $535.00 |
| Out-of-pocket medical expenses | 40.00 |
| Roth IRA contributions | 83.33 |

In sum, Wolter's personal expenses total $658.33. The specific expenses established through testimony total $2974.50, not including tithing, Halverson's out-of-pocket medical and dental expenses, prescriptions, car insurance, homeowners insurances, property taxes, clothing, or any other typical expenses. Halverson's bank account activity in the months preceding the filing of his bankruptcy petition generally showed withdrawals exceeding deposits. Their separate bank account statements for the period of January 1, 2008 through August 31, 2008 (for Halverson's account) and December 15, 2007 through August 14, 2008 (for Wolter's account), show that their average paid expenses during that period amounted to approximately $5000.00 (not including student loans), which exceeds their combined after-tax income of $4683.98 by around $400.00.

Because Halverson and Wolter split their household expenses in half and make separate contributions, Halverson's expected monthly contribution to their paid expenses is approximately $2500.00. With his average monthly income of approximately $2094.17, nothing is available to pay toward his student loans. Alternatively, his monthly contribution to their shared household expenses as established by their testimony is $582.39, not including tithing. When his own medical expenses are added to that amount, his expenses total $1733.79 (not including out-of-pocket medical expenses). Apparently, Halverson has not actually been meeting his goal of a ten percent tithing to his church every month, but if Halverson were to budget for his full tithing, his expenses would total $1943.21 (not including out-of-pocket medical expenses). The income contingent repayment plan payment at Halverson's current household income level would be $534.80 per month. With his tithing, he would only be able to pay $150.96 toward his student loans. Without tithing, he could only afford to pay $360.38. In either event, interest is accruing at a monthly rate of $1,962.79 resulting in negative amortization in the amount of $1427.99 under the ICRP, so his payments would not even scratch the surface of his mounting debt.

## DISCUSSION

■ 11 U.S.C. § 523(a)(8) provides that a chapter 7 discharge does not discharge a student loan "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents." The Bankruptcy Code does not provide a definition of "undue hardship," but the exception of student loans from discharge is intended to "prevent recent graduates who were beginning lucrative careers and wanted to escape their student loan obligation from doing so." *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.2003).[4]

■ The Eighth Circuit has adopted a three-part totality of the circumstances analysis for the determination of undue hardship, which takes into account: "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." *Long* at 554

---

4. For a history of the student loan exception to discharge, at least through 1998, see *Johnson v. Missouri Baptist College (In re John-* *son)*, 218 B.R. 449, 451–54 (8th Cir. BAP 1998).

(citing *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704(8th Cir.1981); *Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 132 (8th Cir. BAP 1999)). "[I]f the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Id.* at 554–55.

■ The debtor bears the burden of establishing by a preponderance of the evidence that excepting his student loan debt from discharge would impose an undue hardship. *Cumberworth v. United States Dep't of Educ. (In re Cumberworth)*, 347 B.R. 652, 657 (8th Cir. BAP 2006).

## Past, Present and Reasonably Reliable Future Financial Resources

■ Halverson is not a recent graduate, and teaching has never been a lucrative career. He has lived with the enormous weight of his student loans for twenty years, receiving hardship deferments while the interest accrued. He is on the cusp of retirement after devoting his life to the education of young people and the care of his family. He recently married a woman of about the same age, but rather than looking forward to spending their golden years in relative peace, the newlyweds' marriage is threatened by the emotional and financial deadweight of ever-increasing loan balances that Halverson will never be able to repay.

In the years since Halverson received his student loans, he has never been wealthy. Between 1988 (when Halverson received his first student loan) and 2005, his taxed Social Security earnings never exceeded $47,056.00. His earnings in those years were approximately as follows: $2,900 in 1988; $1700 in 1989; nothing in 1990; $1700 in 1991; $2700 in 1992; $900 in 1993; $7,000 in 1994; $12,000 in 1995; $26,600 in 1996; $37,500 in 1997; $47,000 in 1998; $24,000 in 1999; $33,300 in 2000; $4,500 in 2001; $400 in 2002; $4,600 in 2003; $300 in 2004; and $8,100 in 2005. He owns no significant assets that he might dispose of to pay his loans. At one time, before taking out any student loans, he owned a home, which he lost in foreclosure. He has not owned a home since.

Currently, Halverson's monthly after-tax income consists of approximately $1,225.00 from employment as a substitute teacher, $418.00 from Social Security and $451.17 from a pension, for a total of $2094.17. The income varies from month-to-month depending on the number of days Halverson actually teaches. Although he continues to look for full-time teaching work, he has been unable to secure a full-time position. He earns $13.50 an hour with no benefits as a substitute teacher. He continues to seek full-time employment, but it has not been possible for him to increase his income beyond the current level and he will never be able to make more than he is making now.

Halverson's future financial outlook is even bleaker. At age sixty-five, he is unlikely to ever find another full-time teaching position. Although he hopes to continue substitute teaching for another five years, there is no real prospect of employment. Halverson's low income is due to reasons beyond his control. He has tried to find full-time work, which would be better-paying and might provide benefits, but he has been unsuccessful. At sixty-five, he is not in a position to find a more lucrative profession. Despite his desire to keep teaching, his health problems are already significant and will continue to increase as he advances in age. Meanwhile, interest accrues at a monthly rate that nearly equals his after-tax income. Hal-

verson will never earn enough to overcome the enormous interest his loans are accruing.

### Reasonable and Necessary Living Expenses

As a preliminary issue, Halverson's income and expenses are examined separately from Wolter's income and expenses. This is a second marriage between two people over the age of sixty-five who have grown children. Halverson and Wolter are not a young couple with many years of potential wealth-building ahead of them. They entered into the marriage with the express intent of remaining as financially independent as possible. They have maintained separate bank accounts and do not exercise control over each other's funds. They approach household expenses essentially as roommates might, dividing shared expenses in half and contributing separately from their own accounts. It was their mutual intent and understanding upon entering into marriage that Wolter would not assume any of Halverson's debts. In furtherance of that intention, they executed an antenuptial agreement that memorialized their understanding that their premarital property would not become marital property, and that neither party would be responsible for or obligated to pay any liability incurred by the other. Wolter testified that her intention was always to preserve her property for herself and her children. Shortly after their wedding, Wolter underwent surgery. In anticipation of the surgery, she executed a will, stating that none of her property would pass to Halverson in the event of her death except that he would be able to remain in her house for six months. The marriage is clearly troubled already, and divorce is a real possibility. Should the couple divorce, Halverson would receive nothing from Wolter for support.

██ Generally, a spouse's income may be considered in the undue hardship analysis. *Cumberworth* at 657. However, a spouse's income is considered not to increase a debtor's gross income but rather to the extent that it decreases his monthly expenses. It would be unfair to expect her to either pay all of Halverson's personal expenses just so he can make payments on a loan he incurred years before the marriage, or to pay those loans for him. See, e.g., *Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 535–36 (8th Cir.2005) (Bright, J., concurring) ("While it is true that the income and expenses of husband and wife are combined for the purpose of examining a household's finances, it does not seem proper, in the circumstances where the debtor and non-debtor spouse have contributed about equally to the family income and expenses, to attribute the entire surplus to the debtor in favor of the debtor's creditors."). "[S]pousal income should not be made liable for debts incurred by the debtor." *In re Berndt*, 127 B.R. 222, 224–25 (Bankr.D.N.D.1991). As a result, Mary's personal expenses, including her tithing, are not even relevant to the discussion; she is free to dispose of her income as she sees fit. While in the past Wolter paid Halverson's health insurance premiums, now that Halverson is on Medicare he pays his own healthcare expenses. Wolter is not currently reducing Halverson's expenses except to the extent of paying her equal portion of the shared household expenses established at trial and her income should not be attributed to Halverson beyond that contribution.

██ ECMC only objected to three of Halverson's *established* expenses: travel, restaurants and entertainment, and his church tithing. Halverson's expenses are "modest, not extravagant, and commensurate with the debtor's resources." *Limk-*

*emann v. United States Dep't of Educ. (In re Limkemann)*, 314 B.R. 190, 195 (Bankr. N.D.Iowa 2004). Debtors pursuing the discharge of student loan debts are "not expected or required to implement every conceivable cost-saving measure" so long as the total expenses are minimal. *Id.* Halverson and Wolter have only taken two trips since they married, spending one weekend in Grand Rapids for Halverson's senior class reunion and one weekend in Duluth, visiting family. Two in-state trips over a year and a half that cost approximately $250.00 each amount to a monthly expense of less than $30.00. Travel for a senior class reunion is not necessary, but the expense was reasonable and the trip was by no means extravagant. Halverson and Wolter drove there, ate modest meals, and stayed at a reasonably priced hotel. The reunion was a once-in-a-lifetime event and not a recurring expense. The second trip, to visit family, was not necessary, but was reasonable. Again, they drove themselves there, ate modest meals, and stayed at a reasonably priced hotel. Halverson has five siblings, only one of whom lives in the Twin Cities. It is understandable that he would want to visit them with his new wife. An occasional visit to family is not an extravagance.

The restaurant and entertainment expenses described by Halverson and Wolter were not unreasonable. Although Halverson spent approximately $200.00 at restaurants in April of 2008, the couple spends approximately $50.00 per month on average at restaurants. If Halverson stopped going out to eat, it is not clear how much money would be available to pay his student loans, since the cost would likely be replaced with additional groceries. The couple splits expenses, so even if it is assumed that the cost of dining at home would be half the cost of dining in a restaurant, Halverson would likely only save himself about $12.50 per month. The

plaintiff's bank account statements also show visits to the movie theater approximately once a month, with a cost of between $20.00 and $30.00. While going to the movies is not a necessary living expense, it is the plaintiff's only entertainment expense and it is not an unreasonable amount to spend on entertainment. If Halverson were to cut out restaurant dining and movies, he might save approximately $27.50 per month.

■ ECMC objected to Halverson and Wolter's church tithing. At most, Halverson's monthly expenses include $209.42 for his church tithing. Tithing is not *per se* unnecessary and unreasonable. *Cline v. Ill. Student Loan Assistance Assoc. (In re Cline)*, 248 B.R. 347, 351 (8th Cir. BAP 2000); *Meling v. United States Dep't of Educ. (In re Meling)*, 263 B.R. 275, 279 (Bankr.N.D.Iowa 2001). Although tithing is not required for membership and a ten percent contribution is significant, that contribution level is within a reasonable limit given Halverson's overall finances and dedication to his church. There was no evidence that Halverson has actually been making his tithes in months when he could not afford it. He testified that although he considers tithing a regular expense, he cannot always meet his tithing goal. His personal history is entwined with his church membership, and suggests that his belief in financially contributing to his church is a long-held and sincere one. As noted earlier, even if Halverson discontinued his tithing, it would not make his student loans affordable. Wolter's tithing is not necessarily relevant. She pays half of Halverson's household expenses. What she does with the rest is none of our business.

The expenses to which the defendant objected may not have been necessary, but they were reasonable and even without

them, the plaintiff would still be heavily burdened by his student loan debt and unable to make meaningful payments on the loans. Halverson's healthcare expenses are both necessary and reasonable, and his advancing age makes it very likely that the expenses will only increase over the next twenty-five years. In addition, the shared expenses established at trial, including electricity, gas, water, sewer, garbage, phones, internet, groceries, gas, car maintenance, lawn maintenance, and home maintenance, are necessary and reasonable.

### Other Relevant Facts and Circumstances

Halverson has never been able to afford his total student loan payments, and now that he is about to retire, the prospects of repayment approach impossibility. Even the prospects of keeping up with interest are improbable. Halverson has been unable to find a higher-paying job, and within five years, will be unable to work at all.

### A. Timing

Halverson is not a recent graduate. He completed his last degree in 1994. Fifteen years have passed between his graduation and the commencement of this proceeding, and the debtor is now of retirement age. He is not the sort of "deadbeat" graduate whose perceived abuse of bankruptcy laws spurred Congress to pass the provisions excepting student loans from discharge. Rather, Congress was concerned with "Tales of professional students discharging their educational obligations through bankruptcy," writing off their debt, and then embarking on lucrative careers. See, e.g., *Johnson v. Missouri Baptist College (In re Johnson)*, 218 B.R. 449, 451 n. 4 (8th Cir. BAP 1998). Unlike the high-earning-potential graduates whom Congress sought to rein in, Halverson is a teacher who has simply been unable to make much money.

It is clear to him only now, as he approaches the final years of his career, that despite his efforts at full-time employment, he will never be able to repay all of his debts.

### B. Effects of Debt on the Marriage

▮ Non-economic factors such as the effect of student loan debt on the debtor's mental health are also relevant. *Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526 (8th Cir. 2005). Already, Wolter has suffered physical manifestations of the stress and it is not clear that their marriage will survive the hardship. Halverson feels deep shame and regret about the loans. The marital stress is likely to continue or increase if the loans are not discharged. I have previously noted that a debtor who pays little or nothing on his loans under the ICRP will be burdened by growing debt "for the better part of his life, eliminating or severely curtailing the debtor's ability to incur credit in an increasingly credit driven economy." *Korhonen v. Educ. Credit Mgmt. Corp. (In re Korhonen)*, 296 B.R. 492, 497 (Bankr.D.Minn.2003). In this case, his new wife's credit will be damaged as well, despite her lifetime of frugality. Their ability as a married couple to finance their retirement years and to spend those years in peace will be greatly diminished by the emotional toll of these loans.

### C. Ratio of Student Loan Debt to Overall Debt and Good Faith Efforts

▮ Although the dominant purpose of Halverson's bankruptcy petition was to discharge his student loans and his only other scheduled liabilities were $4,367.38 of unsecured consumer debt, Halverson acted in good faith. He was very credible in his testimony that he did not fully appreciate the enormity of these loans, failed to com-

prehend the effect of interest, and is simply not good with money. Despite the fact that his taxed Social Security earnings from 1988 (when he took out his first student loan) to 2005 never exceeded $47,056.00, he has paid over $26,000.00 to student loan creditors. After all, the promise of bankruptcy is a fresh start gained by discharging existing debt. The fact that the debt burdening a debtor is of one kind does not in and of itself deprive a debtor of his right to that fresh start.

### D. ICRP

Now that Halverson is married, ECMC considers his wife's income to assess his ability to pay his loans. Even if Halverson's wife were forced to liquidate her modest life savings, they would not currently have enough money to repay these loans, and their income is about to significantly decrease as they both enter their retirement years. The possibility looms that the debtor's mother and younger son may soon require additional assistance, further limiting the debtor's availability for employment. Without participation in the ICRP, there is no question that Halverson would not be able to afford to pay back a nearly $300,000.00 loan that is accruing interest at a rate of approximately $2,000.00 per month, and that those loans are an undue hardship.

■ ECMC argues that because Halverson is eligible for the ICRP, the loans are not an undue hardship. The ICRP may be useful for many individuals and under some circumstances might support the nondischargeability of student loans under the totality of the circumstances analysis, but its availability under these particular circumstances does not remove or lessen the hardship of these debts on the plaintiff. The ICRP provides for annual payment of the lesser of "(i) The amount the borrower would repay annually over 12 years using standard amortization

multiplied by an income percentage factor that corresponds to the borrower's adjusted gross income (AGI) as shown in the income percentage factor table in a notice published annually by the Secretary in the Federal Register; or (ii) 20 percent of discretionary income." 34 C.F.R. § 685.209(a)(2)(i)-(ii). Halverson's ICRP would be based on twenty percent of his discretionary income, which is defined as the borrower's household adjusted gross income minus the amount of the poverty guideline for his family size. 34 C.F.R. § 685.209(a)(3). The maximum repayment period is twenty-five years, and at the end of the repayment period, the unpaid portion of the loan is cancelled. 34 C.F.R. § 685.209(c)(4)(i), (iv). The amount cancelled is considered taxable income to the borrower. *Korhonen* at 497.

■ The task 11 U.S.C. § 523(a)(8) places before a court is to determine whether the loans are an undue hardship for the plaintiff, not whether the ICRP payments are an undue hardship. With or without the ICRP, I find that they are an undue hardship. The ICRP may considered by courts in the analysis of undue hardship, but it is not determinative. *Lee v. Regions Bank Student Loans (In re Lee)*, 352 B.R. 91, 95 (8th Cir. BAP 2006). "Placing too much weight on the ICRP would have the effect in many cases of displacing the individualized determination of undue hardship mandated by Congress in § 523(a)(8) since the payments on a student loan will almost always be affordable, i.e., not impose an undue hardship on a Debtor." *Id.* at 95–96. The ICRP presumes that the debtor has the "ability to pay 20% of the difference between her adjusted gross income and the poverty level for her family size." *Id.* at 96; 34 C.F.R. § 685.209(a)(2)(i)-(ii). "[I]t serves a fundamentally different purpose than the discharge provisions (and exceptions thereto) of the Bankruptcy Code," does not further the Bankruptcy Code's purpose of

providing a fresh start to "honest but unfortunate debtors," does not entail a "case-by-case analysis of a debtor's income in relation to her reasonable expenses," and "might even be viewed as inimical to the goals of the fresh start because the ICRP allows for negative amortization of the student loan debt and a potentially significant tax bill if the student loan is ultimately forgiven after 25 years." *Id.* at 96–97. The ICRP affordability analysis does not allow for consideration of this debtor's unusually high medical expenses due to his advancing age, or the financial and psychological impact of living with over $300,000.00 of debt and then facing a tax liability in his nineties that could equal his lifetime earnings.

This is one of the exceptional cases where the ICRP payments are not even affordable. Clearly, without Halverson's wife's income, the ICRP is not affordable. His bank records show that he has no discretionary income available for loan payments without help from his wife. The expenses established at trial similarly show that even if he eliminated several unnecessary but reasonable expenses, he still could not afford the ICRP now or ten or twenty years from now without his wife's help. If the court were to deny discharge of these loans, it would have the effect of forcing the plaintiff's wife to assume his expenses or stop her personal church tithing in order to make payments on her husband's loans. It is not at all clear that her potential sacrifices would be enough to make the loans affordable. Under these circumstances, it would be inappropriate and unfair to force his non-debtor spouse to make up the difference. It is not even certain that their marriage would survive a denial of the discharge of these loans. In that event, Halverson would suddenly face increased housing expenses that would likely prevent him from paying even a few dollars on his loans. Although the ICRP allows midyear reconsiderations

of affordability, those considerations are based on income and hypothetical affordability and do not take into account the real expenses of the debtor.

ECMC argues that Halverson could have made a payment on his student loans with the money he used to hire a bankruptcy attorney and to litigate this action, but Halverson's attorney's fees were not unreasonable, it was not established that he has personally paid anything yet for the services, and in any event, he is within his rights to hire an attorney for this purpose. ECMC further argues that Halverson could afford the ICRP by working full-time, but Halverson has been unsuccessful in his search for full-time work in the area for which his degrees qualify him. At age sixty-five, it is unrealistic to ask him to choose a new career in a more lucrative profession.

## CONCLUSION

Although the parties did not address the two loans separately, the undue hardship analysis must be applied individually to the two loans. *Andresen* at 137. Excepting Halverson's total student loan debt from discharge would result in an undue hardship to Halverson and his dependent, but Halverson has the ability to pay something without undue hardship. ECMC is the holder of two loans. Repayment of the April 13, 2005 ECMC consolidation loan, which had a balance of $213,850.62 on December 29, 2008, would result in an undue hardship for Halverson and his dependent. However, repayment of the February 9, 2005 ECMC consolidation loan, which had a balance of $11,363.29 on December 29, 2008, would not result in an undue hardship for Halverson and his dependant. Although the exact repayment amount is not in the record, the interest on the smaller loan accrues at a rate of $2.48 per day or around $75.00 per month. There is enough flexibility in Halverson's budget to pay this loan without undue hardship.

## ORDER

IT IS ORDERED:

1. The plaintiff's debt to defendant Educational Credit Management Corporation represented by the February 9, 2005 consolidation loan is excepted from the plaintiff's discharge.

2. The plaintiff's debt to defendant Educational Credit Management Corporation represented by the April 13, 2005 consolidation loan is not excepted from the plaintiff's discharge.

3. The plaintiff's debts, if any, to defendants U.S. Department of Education, American Education Services, Wells Fargo Educational Financial Svcs, and "USEFG, ELT BONY T IV" are not excepted from the plaintiff's discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY