**In re Michele D. WALKER, Debtor.**

**Michele D. Walker, Plaintiff,**

**v.**

**Sallie Mae Servicing Corp., SLM Education Credit Finance Corporation, Zwicker & Associates P.C., and Kohn Law Firm, S.C., Educational Credit Management Corporation, Defendants.**

**Bankruptcy No. 04–32012.
Adversary No. 07–3164.**

United States Bankruptcy Court,
D. Minnesota.

June 18, 2009.

843

Joseph A. Skokan, Piletich & Skokan, P.A., Stillwater, MN, for Plaintiff.

Linda J. Jungers, Stewart Zlimen & Jungers Ltd., Roseville, MN, Henry T.

Wang, Gary Plant Mooty Mooty & Bennett PA, Minneapolis, MN, for Defendants.

## MEMORANDUM DECISION AND ORDER

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding for determination of dischargeability of debt came on before the Court for trial. The Plaintiff appeared personally and by her attorney, Joseph A. Skokan, Piletich & Skokan, P.A. Defendant Sallie Mae Servicing Corporation ("Sallie Mae") appeared by its attorney, Linda J. Jungers, Stewart Zlimen & Jungers, Ltd. Defendant Educational Credit Management Corporation ("ECMC") appeared by its attorneys, A.L. Brown, Educational Credit Management Corporation, and Henry T. Wang, Gray Plant Mooty Mooty & Bennett, PA. The following decision is based on the evidence received at trial and the arguments of counsel.

## NATURE OF ADVERSARY PROCEEDING

The Debtor filed a voluntary petition for relief under Chapter 7 on April 2, 2004.

On July 12, 2004, she received a discharge in bankruptcy in the resulting case.

On August 15, 2007, the Debtor filed the complaint that commenced this adversary proceeding. The Defendants are creditors scheduled in her bankruptcy case. As of May 19, 2008, ECMC held a claim against the Debtor with a balance of $283,354.50 in principal, interest, and related fees; Sallie Mae held a claim against the Debtor with a balance of $29,253.75 in principal, interest, and related fees.[1]

The Debtor's debts to ECMC and Sallie Mae arose from educational loans made to her.[2] Those loans funded the study through which the Debtor obtained an undergraduate (bachelor's) degree, plus her attendance at the first half of a medical school curriculum. These debts were excepted from discharge in the Debtor's bankruptcy case. The Debtor seeks to override that exception through the sole means provided under the statute, and to obtain a determination that the debts were discharged in her bankruptcy case. To do so, she had to prove that "excepting such debt from discharge ... would impose an undue hardship on [her] and [her] dependents ..." 11 U.S.C. § 523(a)(8).[3] The Debtor bears the bur-

1. ECMC and Sallie Mae are the current, and sole, real parties in interest as defendants. The other named defendants did not answer the Plaintiff's complaint.

2. ECMC and Sallie Mae are the assignees of the rights of the lenders that originally advanced to the Debtor.

3. In the iteration that applies to this adversary proceeding, 11 U.S.C. § 523(a)(8) provides an exception from discharge:

> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or sti-

> pend, unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents ...

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 ("BAPCPA"), amended § 523(a)(8) in its description of the sorts of debt that fall under its exception, and by a reformatting of the text. The Debtor filed for relief under Chapter 7 before the October 17, 2005 effective date of BAPCPA, so the previous text, as quoted, applies to this adversary proceeding. BAPCPA's amendment did not affect the wording of § 523(a)(8) that applies here, i.e., the threshold exception from discharge and the undue-hardship escape from it. That exception is self-executing; it does not require a court order or judgment to activate it. S.REP.

dens of production and persuasion on the issue of undue hardship. *In re Cumberworth*, 347 B.R. 652, 657 (8th BAP Cir. 2006); *In re Ford*, 269 B.R. 673, 675 (8th Cir. BAP 2001).

## BASIC FACTS: THE DEBTOR'S VOCATIONAL AND FAMILIAL PROFILE[4]

The Debtor is a woman now 42 years of age, of African–American descent.[5] She grew up in inner-city Chicago. From the time she was seven or eight years old, the Debtor wanted to be a physician. Toward this goal, she concentrated on courses in math and science while in high school in the late 1970s and early 1980s. She also took four years of Latin coursework, on her belief that this would better her understanding of medical terminology.

In her freshman year of high school, the Debtor was accepted into CHAMPS, a program hosted by the Illinois Institute of Technology at Chicago. CHAMPS was aimed at inner-city youth, and was designed to prepare them for careers in medical fields. The Debtor participated in CHAMPS throughout high school. She continued it after her graduation in 1983 and her enrollment that year at the University of Illinois at Urbana. The program gave her an orientation to the medical field; later it required her to serve as a preceptor (tutor and mentor) in science for younger participants. Her involvement in CHAMPS required her to give up much of the free time that teenagers and young adults normally relish.

The Debtor attended the University of Illinois on a full-time basis for "about five years," majoring in biology and taking the pre-med curriculum. She financed her attendance through educational loans—the subject of this adversary proceeding includes the remaining debt on them—and work-study programs.[6] She found the study "challenging"; she remembers that "essentially [her] life" was spent on her coursework during those years. She maintained an undergraduate grade-point average of "B."

The Debtor received her bachelor's degree from the University of Illinois in 1989. She was accepted to the University of Illinois College of Medicine in Chicago. After attending a medical school preparatory course at Creighton University in Omaha, she enrolled in the Chicago program in the fall, after her graduation from college. Her plan was to use her medical credential to become a psychiatrist.

The Debtor financed her attendance at medical school through educational loans; the currently-outstanding debt on them is the bulk of the subject of this adversary proceeding.[7] She also held various sorts

No. 95–989, at 79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5865.

4. The recitations in these sections are findings of fact that go to the more general events of the Debtor's educational experience and work history, and the more basic characteristics of her lot in life at present. The intent is to give a broadly-brushed picture. The analysis section of this decision will incorporate additional, more narrow findings, as to important facts that are relevant to the several considerations under the binding precedent.

5. Strictly speaking, the Debtor's race is irrelevant to the legal analysis. However, identify-

ing it puts many aspects of her story and situation into context—both as the narrative of one human being's life, and as they bear on the merits of her bid for broad relief in bankruptcy.

6. Apparently ECMC is the assignee of the rights to payment on account of the loans made to the Debtor for her undergraduate studies.

7. Sallie Mae's claims against the Debtor arose from loans made to her during medical school. Apparently, ECMC is the assignee of

of employment to raise money for her living expenses. At turns, she worked as a dormitory resident assistant, a research assistant, and a pharmacy technician at Walgreen's.

The academic phase of medical school is the intensive coursework that normally takes the first two years. The Debtor found this regimen more challenging than her undergraduate studies had been. In response, she transferred from her medical school's four-year program to its five-year program. She ultimately completed the coursework.

In 1995, the Debtor took the first set of "the boards," the multi-part licensing and competency exams that are a prerequisite for licensing for physicians-in-training. This first segment is given after the completion of the classwork component of medical school. The Debtor failed this first round by one point. The authorities at the University of Illinois not only refused her leave to take these exams again; they recommended her dismissal from the medical school program. The Debtor appealed that determination, "as far as it could go" through the University's grievance procedures. She was unsuccessful. The reason cited for the ratification of her dismissal was "failure to progress in a timely fashion."

The Debtor was dismissed from medical school. She consulted an attorney as to the possibility of litigation against the University of Illinois. She could not afford the retainer quoted. She did not pursue legal relief.

After her years of effort, with the end of her long-time dream of being a doctor, the Debtor was left "very stunned, for a long while." Over the next year to two years, she worked as a pharmacy technician, making approximately $6.00 per hour, and then as a substitute teacher in the Chicago public schools.

While the Debtor was working as a pharmacy technician, she met Troy Walker, a police officer for the City of Chicago. They got married in 1996. For a period of time after the wedding, the Debtor "did not pursue anything" and did not work. Then, she concluded that a psychology credential could enable her to pursue something close to her older career aspiration and would allow her to use some of her past education. She applied to and was accepted into a master's degree program at Governors State University in University Park, Illinois in 1997. Recognizing that she already had large debts from educational loans, the Debtor avoided borrowing to finance this course of study. Her husband paid for part of the expenses; she worked as she was able in order to make up the balance. She finished her master's studies and received that degree in 2000.

The Debtor bore the first child of her marriage, a daughter, in 1998, while she was still a master's student. She had a first set of twin sons in May, 2000, and a second set in October, 2001. She has had no further children.

In 2002, the Debtor, her husband, and their children moved to Minnesota. Their reasons were several and varied: the excessively-high cost to house a family of their size in the city of Chicago, where Troy was required to live by the terms of his employment; the generally-higher cost of living in Chicago; their perception that the Twin Cities offered a safer environment to raise children, and one more welcoming to biracial children; Troy obtaining employment as an officer with the Minneapolis Police Department; and the Debtor then obtaining a full-time post-graduate

the lender's rights on other loans made to the Debtor during medical school.

internship as a school psychologist with the Minneapolis Public Schools.

The Debtor's internship was to pay her between $16,000.00 and $17,000.00 per year, on a full-time basis. However, once her family had established a new home in Minneapolis, she found she could not sustain full-time working hours; there were conflicts between Troy's variable, multi-shift work schedule and her own fixed schedule oriented around school hours, and the pressures of caring for five children of pre-school age. These things prompted her to get her internship reduced to a part-time schedule. She sustained the internship for two years to make up her commitment to one full year of service, and she completed it in the 2003–2004 school year. By that time the Minneapolis Public School District was operating under serious budgetary strictures. Current District employees were being laid off; there were no permanent openings for a school psychologist for which the Debtor could apply.

Around that time, the Debtor and her husband purchased a house in Hudson, Wisconsin, and moved their family there. She inquired about openings for school psychologists in the Hudson district, and was told there were none. The Debtor's investigation has revealed that she would have to take further educational courses and pass additional testing to get licensed as a school psychologist in Minnesota. The cognate requirements for Wisconsin licensure would be even greater, because the Debtor did not get her degree from a Wisconsin-sited institution.

After the Debtor inquired of the Hudson School District, she fell back on her earlier work experience as a pharmacy technician. She was hired by the local Wal–Mart, at $7.15 per hour. But relatively soon, the Debtor and her husband found that it was just not economically or personally feasible for her to keep this job. The cost of daycare during her working hours consumed all of her net earnings and more; her employment at Wal–Mart actually caused a net drain on the household fisc. In addition, there were continuing conflicts between her work schedule and the schedule Troy had to keep for the Minneapolis Police Department, plus such security-related secondary employment as he could take on off-hours. And, there arose an increasing need for the Debtor's presence in assistance to her children (about which, more later).

So, the Debtor left that employment. She has not worked for a third-party employer since 2004. With Troy more able to take part-time "moonlighting" as a security officer on a regular and predictable basis, the couple has not been under so much financial pressure that the Debtor had to be employed outside the home, in order to meet their family's very basic daily needs. And the increase in Troy's earning capacity from secondary employment coincided with the emergence of that new need for the Debtor's presence at home; so Troy's enhanced earnings took the edge off the Debtor's inability to make herself available for paying employment.

In the fall of 2007, the Debtor enrolled in an associate's-degree program toward licensure as a registered nurse, at Chippewa Valley Technical College. She did this with the idea of gaining a different career in medicine, and as a means of eventually contributing financially to her family's maintenance in her own right.[8] Her father helped her pay the tuition, and Troy

---

**8.** The Debtor testified that by that time Troy was having physical difficulty "keep[ing] up this pace," working one full-time job and one or two part-time ones. They decided together that she would try again to get into a career of her own.

paid the rest. As the Debtor testified, "things did not work out during her first semester." The program required her to be put into hospital-sited clinical placements at that early stage; but she was unable to maintain attendance satisfactorily to the program because of pressing distractions related to her family.[9] She was put "on intermediation," i.e., some form of academic sanction, for her poor attendance. She left the program after one semester.

### GOVERNING LAW

Early after the enactment and effective date of the Bankruptcy Code of 1978, the Eighth Circuit Court of Appeals issued one of the first appellate constructions of the "undue hardship" provision of 11 U.S.C. § 523(a)(8). *In re Andrews*, 661 F.2d 702 (8th Cir.1981) set forth a totality-of-the-circumstances approach to the undue hardship issue, which entails a three-part factual inquiry into the situation and prospects of a debtor who is liable on educational-loan debt. Over two decades later, the Eighth Circuit reaffirmed its adherence to the broadly-oriented *Andrews* standard— despite the intervening development and adoption of a more closely-worded and - focused test by almost all of the other circuits. *In re Long*, 322 F.3d 549, 554 (8th Cir.2003). *See also In re Reynolds*, 425

F.3d 526 (8th Cir.2005), *cert. denied*, 549 U.S. 811, 127 S.Ct. 46, 166 L.Ed.2d 20 (2006).[10]

■ In the application of its three considerations, the *Andrews/Long* standard is not "progressive," or sequential. The three considerations are not taken in stages, as individual hurdle-points at which a debtor could lose. *In re Reynolds*, 303 B.R. 823, 837 (Bankr.D.Minn.2004), *aff'd*, 425 F.3d 526. "Ultimately, the trial court is to consider the whole mix, assigning appropriate weight individually to 'the unique facts and circumstances that surround the particular bankruptcy.'" *Id.* (quoting *In re Long*, 322 F.3d at 554). *See also In re Andresen*, 232 B.R. 127, 136 and 140 (8th Cir. BAP 1999).

■ A major focal point of the analysis, of course, is financial: the debtor's de facto ability to pay the educational-loan debt over a relevant period of time, determined by deducting the "reasonably necessary living expenses" to be attributed to the debtor and the debtor's dependents from the debtor's "reasonably reliable future financial resources." *In re Long*, 322 F.3d at 554–555; *In re Andrews*, 661 F.2d at 704; *In re Andresen*, 232 B.R. at 139. *See*, in general, discussion in *In re Pollard*, 306 B.R. 637, 651–652 (Bankr.D.Minn. 2004).[11] The prospect of an income sur-

---

**9.** The disruptions to her attendance were, again having to leave for home or her children's school on an unpredictable basis, and her husband's shift schedule. Though there were scheduled clinical sessions in the evening, she had to stay home with the children too often; and because the participating hospitals had set specific blocks of placement time, the Debtor was unable to arrange a schedule tailor-made to her needs.

**10.** ECMC was one of the educational-lender creditors in *Reynolds*, and the one that petitioned for certiorari. It used its petition to urge that the United States Supreme Court adopt the competing construction of

§ 523(a)(8), the one first enunciated at circuit-level in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir.1987). Petition for Writ of Certiorari, *Educ. Credit Mgmt. Corp. v. Reynolds*, 2006 WL 1126177 (Apr. 26, 2006), *cert. denied*, 549 U.S. 811, 127 S.Ct. 46, 166 L.Ed.2d 20 (2006). Had the Supreme Court granted certiorari and then adopted ECMC's substantive argument, the *Brunner* test would have been imposed on the Eighth Circuit. The denial of certiorari ended that bid to lever our Circuit's approach.

**11.** The debtor's financial resources and living expenses are two of the three factors identi-

plus for debt repayment is determined both in light of the debtor's current circumstances, and over a future time, to the extent that currently-available evidence permits. *In re Long*, 322 F.3d at 554–555 ("reasonably reliable future resources" and "the prospect of future changes—positive or adverse—in the debtor's financial position" are relevant to the undue hardship inquiry).

■■ In passing on the issue of undue hardship, the trial court may also consider non-pecuniary factors, as part of the "other relevant circumstances" that are the third consideration under *Andrews* and *Long*. These may include the debtor's physical and mental health and marital relationship, and the extent to which liability on large educational-loan debts is a stressor affecting the strength and stability of these aspects of an individual's life. *In re Reynolds*, 425 F.3d at 532–534; *In re Halverson*, 401 B.R. 378, 388 (Bankr. D.Minn.2009). Only rarely will these factors completely outweigh proof of an income surplus of some amount, so as to merit a determination of undue hardship despite a demonstrated ability to make some amount of payment on educational-loan debt. *In re Reynolds*, 303 B.R. at 837–839 and 841. However, in any case such circumstances may be factored into the broad, holistic analysis of undue hardship under *Andrews* and *Long*, and they may be assigned some weight even if they are not to be deemed determinative. *Id.*; *In re Halverson*, 401 B.R. at 388.

## APPLICATION AND DISCUSSION

■ This precedent accords substantial deference to the trial court's exercise of an "inherent discretion" in the evaluation and weighting of the relevant facts and circumstances. *In re Long*, 322 F.3d at 554. *See also In re Cumberworth*, 347 B.R. at 658 ("... the proper analysis requires the bankruptcy court to closely examine the individual facts of a particular case and not mechanically apply a rigid rule ..."). However, the Eighth Circuit classifies the ultimate outcome on undue hardship as a conclusion of law rather than a finding of fact. *In re Long*, 322 F.3d at 553 and n. 9. This makes the end-result, the determination of winner-and-loser, reviewable *de novo* on appeal. *Id.* Thus, it is incumbent on the trial court to detail its supporting findings for each of the relevant considerations, and then to clearly set forth the logical bases for its conclusion.

### 1. The Debtor's Financial Resources, Present and Future

Under the *Andrews/Long* test, "the debtor's past, present and future financial resources" are the starting point. *In re Reynolds*, 425 F.3d at 529. Here, the Debtor's only possible "resource" for repayment is ongoing income earned by her or deemed available to her. The record contains no evidence of cash, investments, or other liquid assets in which she has an interest. Nor does the Debtor own any tangible property that is not essential to meeting some daily need of herself or the six other members of her family.[12]

---

fied in *Andrews*. *In re Reynolds*, 425 F.3d at 529; *In re Long*, 322 F.3d at 554.

**12.** The Debtor and her husband own a house in Hudson, Wisconsin. They paid $237,000.00 for it in 2004. At the time, this price did not reflect lavishness or extravagance for a house for a seven-person family in the Hudson market. At trial, the Debtor opined that market appreciation might have raised the value to $260,000.00, before the severe contraction in the regional and national real estate markets in 2007–2008. The Debtor's husband holds the title to four motor vehicles, three of which were free and clear of liens as of the date of trial. Only two of them—a 1998 Ford Windstar van and a 2007 Chevrolet Suburban SUV—were directly

For the purposes of a "snapshot," two points in time are relevant to the analysis.[13] As to the Debtor's own income, the answer to this inquiry is simple: she had no earnings in her own right, as of the earlier date, and she has none now. When she received her discharge in bankruptcy, in mid-July of 2004, the Debtor was not employed. There was a very good reason for that. She had four children of pre-school age, plus one in the first years of elementary school; she had had significant logistical difficulties managing childcare for a part-time internship, given her husband's variable work schedule; her postgraduate internship had just ended; and she was not having luck finding a permanent position as a school psychologist.

And in the recent past, an additional factor had arisen that bore on the Debtor's ability to leave the home for employment on a sustained and regular basis: her twin sons who were born in 2000, then four years old, had been diagnosed with a form of autism in 2003. In her testimony, the Debtor did not speak to the impact that the outward manifestations of her sons' condition had had on daily life in her household in 2004. However, it is undeniable that it posed a further distraction and responsibility for her, of material degree.

As of the date of trial, the Debtor was still not employed outside the home. By then all five of her children were enrolled in school. Her two sons with autism, then eight-plus years old, attended school on a

available to the family at that time. (A 1998 Saturn was in the possession of the Debtor's mother, who was then in financial straits; a 2004 Kia Sedona van was "in the shop" for repairs and the Debtor and Troy currently lacked funds to pay to get it back.) The Ford Windstar and the Saturn were no doubt of marginal dollar-value due to their model and decade-long age, even if they were operating. The other two, obviously, are more reliable sources of transportation; they are the presumptive means for Troy's twenty-plus-mile commute to Minneapolis and for the Debtor's use in meeting the household's needs. The Debtor's bankruptcy schedules from 2004 showed no other assets of any meaningful, liquifiable value that would not be necessary to support the daily needs of her family.

13. This observation gives the benefit of the doubt to ECMC on its cursorily-pleaded defense of laches, i.e., that the Debtor had waited too long after her bankruptcy filing to sue out the dischargeability issue under § 523(a)(8) and should be denied judgment on equitable grounds. ECMC's counsel did not brief this defense for trial, and revived it only in closing argument. ECMC did not frame it as such, but this defense has a basis in an observation by the Eighth Circuit in another context: the determination of dischargeability on educational-loan debt "should take place relatively close to" the date of discharge. *In re Bender,* 368 F.3d

846, 848 (8th Cir.2004). *See also In re Woodcock,* 326 B.R. 441, 447 (8th BAP Cir.2005). The *Bender* court referred to the date of discharge as "the relevant date" as of which "the debtor's actual circumstances" are to be determined. However, up to the point of final argument, ECMC and Sallie Mae silently acquiesced in trying this matter as if the sole relevant date were the time of trial. As a result, the gambit of waiting until after the closing of the evidence has some sandbagging about it—not exactly consonant with a plea for equitable deference. Because the great bulk of the evidence went to the contemporaneous circumstances, and because the case law does not unequivocally limit the consideration to the date of discharge, findings as to both times will be made. And, contrary to ECMC's protest, findings as to the circumstances in mid–2004 can be made on the record at bar. ECMC's counsel insisted that its defense as to that date had been hampered because "the evidence ha[d] gone"; but he did not point to any concrete prejudice in any aspect of the defense. There is no basis for a complete equitable bar to the Debtor's case on dischargeability. *See Citizens and Landowners Against the Miles City/New Underwood Powerline v. Sec'y, U.S. Dep't of Energy,* 683 F.2d 1171, 1174 (8th Cir.1982) (standards for laches defense). Findings as to the mid–2004 financial circumstances are made here, and *infra* at pp. 856 and 861.

"mainstreamed" basis from 8:55 a.m. to mid-afternoon, five days per week. In the preceding year they had been accepted into WEAP, the Wisconsin Early Autism Project, a state-funded program of intensive therapy for children with autism. For the Debtor's sons' participation in WEAP, the therapy was being conducted on-site in the Walkers' home. The WEAP care plan for them includes a functionally-oriented regimen of occupational and physical therapy (for fine- and gross-motor skills), and a component to promote their socialization and to foster social skills and habits. The Debtor's counsel did not call an expert witness, for an opinion as to the sons' status and prognosis from the perspective of medicine/psychology or education. However, the relative severity of autism-related deficits that both boys manifest is demonstrated by the sustained intensity of the therapy they actually receive.[14]

The WEAP therapists work with both boys eight hours per day on both Saturday and Sunday (8:00 a.m. to 4:00 p.m.), plus an additional nine to nineteen hours per week for each boy on weekday afternoons, after the boys and the Debtor's other children return from school. The therapists involve the Debtor's other children in the socialization therapy, to model appropriate interactive behaviors. WEAP generally requires a parent to be present in the home during a therapist's visit. The Debtor may leave the boys in-home with a therapist "at times," but only "for short periods of time"; and because she is not allowed to leave any of her other children at home during a therapist's visit but without a parent present, she must take all three with her when she leaves. Before the therapists arrive for any visit, the Debtor must spend an average of two hours to prepare for the visit and the therapy; she is required to confer with the therapist to review the boys' current behavior, development, and responsiveness, and to participate in the development of the therapy regimen.

Because Troy regularly works on weekend time under his police-officer schedule or on his secondary employment, the Debtor's responsibilities in relation to the boys and their therapy leaves her without an ability to sustain regular, responsible attendance on any form of scheduled out-of-home employment that would involve a significant sequence of time on the job. The temporal limits on her availability suggest that very casual, low-hour part-time employment without a significant degree of on-job responsibility is her only possible option; but the variability in her time free

14. The Debtor herself testified that one of the boys has "high sensitivity issues," in reaction to sensory input, and the other manifests physical tics like biting and "flapping" of limbs. She also stated that, from her observation, they do not mingle at all with their fellow students on the school playground; instead, they stay on the edge of the area, engaged in repetitive and isolating physical actions like twirling around. She said that neither of them had ever been invited to another child's birthday party or a play date. The forms of non-typical response or behavior manifested by the Debtor's sons are found in persons with autism, in different combinations and with varying degrees of severity consistent with the "spectrum" character of the disorder. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 75 (4th ed. rev.2000) (diagnostic criteria for autistic disorder); NATIONAL RESEARCH COUNCIL, EDUCATING CHILDREN WITH AUTISM 11 (2001) ("Autism is best characterized as a spectrum of disorders that vary in severity of symptoms, age of onset, and associations with other disorders ...") and 211–212; Chris Plauché Johnson et al., *Identification and Evaluation of Children with Autism Spectrum Disorders,* 120 PEDIATRICS 1183, 1190 (2007) ("One of the most challenging aspects in recognizing [Autism Spectrum Disorders] is the wide heterogenerity of features in individual children.").

from family would make that difficult to sustain.

And then there is another complication, intrinsic and unavoidable: the Debtor has to be available during regular school hours to respond to calls from school personnel, if her sons "have a meltdown," i.e., a severe behavioral upset. This behavior is manifested by children with autism; it is precipitated by variation from a usual environment and it is difficult to calm by anyone outside a constant, close relationship with the person experiencing it.[15] The Debtor attested to her sons having such episodes, and to her having to respond quickly to avoid further disruption to the boys' classrooms. She testified that, after direct caretaking for all of the children when they are not in school and her preparation for the therapy visits, she has fewer than four free hours per day. From her description of the therapy schedule, which is staggered by hours day to day, she has no single span of hours for which she would be available on a regular basis, let alone a daily one.[16]

This specific, consuming diversion of the Debtor's time and attention will continue for a total of three years after the commencement of services to the boys under WEAP; the "state waiver," i.e., the Wisconsin-funded subsidy of the significant cost of very intensive autism-related therapy, terminates after three years of participation.[17] The Debtor testified that the boys then could receive some form of counseling or therapy, but on a significantly curtailed schedule, a total of ten to twenty hours per month. It was not clear whether the cost of this would be state-subsidized.

As to the family's continuing struggle against the boys' disability and the cost of therapy after the three-year opening regimen of WEAP, the Debtor could only say that she did not "know what will happen then." She had already placed the boys on a waiting list for living-skills education and

---

15. NATIONAL RESEARCH COUNCIL, EDUCATING CHILDREN WITH AUTISM 97 (2001) ("the need to preserve sameness" is one of "the bizarre behavioral symptoms seen in children with autism") and 49 (children with autism can use aggression and tantrums "to protest against changes of schedule and routine"); Chris Plauché Johnson et al., *Identification and Evaluation of Children with Autism Spectrum Disorders*, 120 PEDIATRICS 1183, 1194 (2007) ("Children with ASDS may protest vigorously when forced to transition ... or ... when a usual routine is changed. Without warning, these protests may quickly escalate to severe and prolonged temper tantrums characterized by aggression or self-injurious behaviors."). In *United States v. Spero*, 382 F.3d 803, 804 n. 3 (8th Cir. 2004), the court recognized this manifestation of autism, citing *PDR Medical Dictionary* 171 (2d ed.2000).

16. In the parties' stipulation of facts, the Debtor acknowledged that she "is able to obtain some form of employment which would generate income." This is all that the

stipulation contains, as to the crucial area of her employability. The utter vagueness leaves this recitation worthless, insofar as meaningful fact-finding directed to potential income sources available to the Debtor. The Debtor also stipulated to having "no physical, medical or emotional disabilities or limitations" herself, and on the witness stand she acknowledged that "physically [she] can work." This only establishes that the Debtor's own personal soundness is not at issue, and is not an impediment to her participation in the employment sector. As noted, however, the record establishes large impediments external to the Debtor herself, which are unavoidable as long as the Debtor is to be a loving, proactive, and deeply-involved parent of children with serious disabilities.

17. Even with the state subsidy/"waiver," Troy's employer-provided medical insurance has an annual deductible of $2,000.00 per person. This must be satisfied for each of the boys before either WEAP or the insurance commences payment of the costs of the therapy.

therapy care for teenagers and adults with autism. She had been told that the current wait for entry into such a program was fifteen years.

The record does not contain any significant, pointed evidence as to what awaits the Debtor and Troy as parents of two young sons with autism, for the coming point of change that is now less than two years in the future, or for the duration of the boys' minority. This is where expert testimony would have really helped, for precision in fact-finding. Notwithstanding, it is fair and wholly defensible to find that, in relation to two sons who will soon approach adolescence, the Debtor will continue to face large challenges that parents of typical children do not have. Under the current development of medical science, there is no recognized "cure" for autism, as that word is commonly understood in popular parlance. The most that can be said currently is that early identification and aggressive, long-term therapeutic intervention can promise amelioration of manifested impairments.[18] The incidence of severity along a spectrum leaves each individual's case unique—subject to that person's own limitations insofar as coping and actual remediation are concerned, and with his or her own, singular prospects of adjustment, education, and improvement in response to intensive therapeutic management.

So no matter what could be divined professionally about the Debtor's sons' status two years hence and later, it is undeniable that the Debtor will continue to be tied to them, for the protection of their safety and the promotion of their health and development, far more intensively for the remainder of their minority than she will be for her other three children—or than any parent of a typical child of like age would be.

On this record, one cannot determine with any precision the degree of future impediment that her sons' condition of autism will impose on the Debtor's employability, for any job that would net an economically-significant benefit to her and her family. But there is no question that the impediment will continue to be vast. The range of the Debtor's past job experience is narrow, and it lay mostly in low-wage jobs. She has been absent from a workplace outside the home for a significant period, at a time in life when most people are establishing and solidifying careers. Her psychology credential has aged, and its development via post-university practice has been stalled for several years. Given all that, one cannot conclude that the Debtor has any cognizable prospect of earning enough to generate any significant net income in her own right, for the coming decade or more.

The sole source of income in the Debtor's household is the wages that Troy, her husband, earns from his "day job" as a Minneapolis police officer, plus his off-hours secondary employment providing security services in the private sector.[19] The

18. Michael D. Kogan et al., *A National Profile of the Health Care Experiences and Family Impact of Autism Spectrum Disorder Among Children in the United States, 2005–2006,* 122 Pediatrics 1149, 1150 (2008); Scott M. Myers et al., *Management of Children with Autism Spectrum Disorders,* 120 Pediatrics 1162 (2007).

19. The presence of Troy's income in the Debtor's family finances would be considered wholly irrelevant, under one judicial approach to the income-resource side of the analysis under § 523(a)(8). *See In re Reynolds,* 425 F.3d at 534–536 (Bright, J., concurring) (opining that only half of admitted household income surplus should be attributed to debtor, who had married after incurring educational-loan debt, whose spouse was not personally liable on the debt, and who contributed amount of income to household that was roughly equal to that contributed by non-debtor spouse). This position was not

parties stipulated that Troy was salaried by the City of Minneapolis at a base of $29.00 per hour, generally working a full eighty hours during every semi-monthly pay period, and he had additional part-time income from his security-officer work. Troy takes overtime from the Minneapolis Police Department, plus the extra security-officer duty, whenever he can; he often works on all seven days of the week.

As stipulated by the parties, the Walkers' combined gross household income for recent years was as follows:

| | |
|---|---|
| 2004 | $59,261.00 |
| 2005 | $59,019.00 |
| 2006 | $63,815.00 |
| 2007 | $67,639.00. |

As presented, the evidence does not make it easy to make precise findings as to Troy's current net monthly income.[20] Despite that, a finding that meets the needs of the analysis can be made.[21] As to the bigger picture, the total of Troy's annual gross wages from the City of Minneapolis for the last year reflected in the record (2007) was $61,325.57, or an average of approximately $5,110.00 per month.[22] His adjusted gross income for tax purposes for that year was $67,639.00. So, he must have had some $6,000.00 in reported gross, taxable income from his part-time employment, or an average of $500.00 per month. There is no evidence in the record from which any FICA or other withholding from part-time income could be determined.[23] Troy had no FICA withholding from his

adopted in the majority opinion in *Reynolds*, and appellate analysis within the Eighth Circuit has not recognized this consideration. Instead, household income has been determined as a whole, regardless of source and without allocation between earning spouses. *E.g., In re Cumberworth*, 347 B.R. at 657 and n. 2. So, Troy's income will be factored into the calculus under the assumption that it is fully-available to the Debtor for satisfaction other individual pre-marital debts.

20. The reasons are several, and are laid at the feet of the Debtor's counsel. He submitted (pursuant to stipulation) Plaintiff's Exhibits 2 and 3 to establish Troy's income. Exhibit 2 consists of "tax return summaries" for the Walkers, printed off the Turbo Tax computer program, for tax years 2004 to 2007, and Troy's W–2 forms from the City of Minneapolis for those years. Counsel did not include W–2 forms from Troy's part-time employer(s). Comparison of the withholding amounts on the W–2s from the City of Minneapolis and the tax return summaries shows that withholding must have been made by the part-time employer(s). Exhibit 3 includes four paycheck summaries for the semi-monthly disbursements of wages from the City of Minneapolis to Troy. (These are presented in a format that overlaps from page to page; they are rife with cryptic abbreviations to denote deductions and withholdings.)

21. This is possible because neither Defendant raised an issue as to the necessity or propriety of any deduction or withholding from Troy's wages; and the only tendered objection as to the form and channeling of Troy's income has no merit in reality.

22. This total, gross figure is the one noted at Item 5 of the W–2, for "Medicare Wages and Tips." The amount is $7,588.00 more than the amount noted at Item 1, for "Wages, Tips, Other Compensation" ($53,737.69). The difference is attributed to the before-tax deductions noted on the paycheck summaries, an employee benefit that results in the reduction of taxable income at the point of payroll disbursement. (Such benefits include employer-sponsored savings programs for medical and child care costs, savings accounts, pre-tax payment of medical insurance premiums, employee contributions to pension plans, and deferred compensation programs. Troy participates in such benefits.) Because the Walkers eventually get the benefit of an in-hand realization on such deductions, their total is properly deemed to him as income for the present analysis. Thus the larger amount reflected on the W–2, that subjected to the Medicare tax, is his gross income.

23. For some reason, the Debtor's counsel did not include W–2s from Troy's part-time income in Plaintiff's Exhibit 2.

police department wages.[24]

These bits of evidence support the finding that Troy had an average gross income of $5,700.00 per month as of the date of trial. This was derived from the wages on which he could count (from the City of Minneapolis), and from the part-time income that has been sufficiently regular and predictable that it can be attributed to him for the foreseeable future.[25]

To arrive at a monthly net income, calculated from annualized experience, the average amount of the Walkers' income tax liabilities must be deducted. For tax year 2007 the Walkers had a total federal liability of only $1,058.00, resulting in a

refund.[26] For tax year 2007, the Walkers had a total state liability of $3,403.00. Dividing the total of the two annual liabilities ($4,461.00) results in an average monthly tax obligation of $372.00.

The other payroll items that should be subtracted to arrive at Troy's deemed net monthly income are the before-tax deductions noted in Plaintiff's Exhibit 3. These total to $934.10 per month.[27] With the actual tax obligations added, the total of subtractions is $1,306.10. When this is taken from Troy's monthly gross of $5,700.00, the result is a net monthly income of approximately $4,394.00 per month for the Debtor's household, as of the date of trial.[28]

---

24. The City of Minneapolis apparently is one of those employers that in the past could opt their employment programs out of the Social Security system.

25. The Debtor testified that it had been difficult for Troy to land much part-time, weekend work for several years after they moved to Minnesota, but that it had gotten much easier and more reliable in recent years.

26. The low amount of this liability is undoubtedly attributed to the number of personal exemptions the Walkers could claim, plus a substantial mortgage interest deduction for the recently-incurred debt to purchase their home in Hudson. Per their 2007 tax return summary, their taxable income for 2007 was $15,865.00, out of their adjusted gross income of $67,639.00.

27. Troy is paid on a semi-monthly basis; some of these deductions are made once per month, others from each paycheck. As indicated by the four paycheck stubs in the record, they are summarized on a monthly basis as follows:

| | |
|---|---|
| HCSP–MSRS | $ 50.00 |
| Def Comp | 300.00 |
| 4 MED CHBtx | 151.60 |
| B Tax Opt L | 28.76 |
| Pension | 403.74 |
| | $934.10 |

There is no explanation for any of these items in the record, but "HCSP–MSRS" is likely a

retirement benefit contribution related to the Minnesota State Retirement System; "Def comp" is obviously directed toward a deferred compensation program of some sort; "4 MED" appears to be the employee's share of a medical insurance premium, treated on a before-tax basis; "B Tax Opt L" may be a life insurance premium; and "Pension" is self-explanatory. Neither of the Defendants asserted that these deductions were voluntary, or that they were not related to some real and reasonable need of the family.

28. On cross-examination, the Debtor stated in summary fashion that Troy's average monthly income was $5,920.00. (To get this answer, ECMC's counsel started by referring to a statement Troy gave in a deposition; he then segued over to whether the Debtor agreed with Troy. She did. However, neither side called Troy as a witness—even though the Debtor testified that he managed the household finances—and no party proffered the content of his deposition testimony as evidence.) The Debtor's testimony and the other evidence establishes that this was a reference to his gross, pre-tax income. The confusion was compounded by the ensuing cross-examination, which elicited the Debtor's statement that the household had a monthly shortfall of $406.00 to $466.00, based on a total of $6,326.00 in expenses. If the assumed income figure did not take account of income and payroll tax liabilities and pre-tax withholdings, an actual shortfall would be larger.

As of the grant of discharge to the Debtor in mid–2004, there is less by way of pointed evidence; but a finding of sufficient accuracy is possible. Per the parties' stipulation, Troy made $59,261.00, gross, in 2004. (There is no way to break down the sources; but based on the Debtor's unrebutted testimony, very little of this came from weekend work, as he had little of it that year.) On a monthly basis, this amounts to gross income of $4,938.00. That was some $762.00 less than Troy's monthly income in 2007. It is not unreasonable to assume that all other income-related deductions and taxes were about the same; if one uses the same numbers, Troy's monthly net income in mid–2004 was $3,632.00. (If one does not retroject the Walkers' minimal federal and state income tax liabilities for 2007 the net is less, by some amount that cannot be determined on this record. The Walkers may well have not had as substantial a mortgage interest tax deduction for 2004; and if so, their annual tax liabilities during that year, deemed to a given month, would have been greater in amount.)

### 2. The Debtor's Reasonable and Necessary Living Expenses

Under *Andrews* and *Long*, the court must identify "the debtor's reasonable and necessary living expenses." *In re Reynolds*, 425 F.3d at 529. The total of these is to be deducted from available and predictable income resources, to determine whether the debtor has a means based in income through which the educational-loan debt can be paid. The case law within the Eighth Circuit uses "a minimal standard of living" as a reference point, as to the reasonableness and necessity of proffered expenses. *In re Long*, 322 F.3d at 554; *In re Andrews*, 661 F.2d at 704; *In re Andresen*, 232 B.R. at 139. However, each debtor's case is to be given "special consideration," with the reasonableness and necessity of given expenditures considered as part of a totality, a combination of "the unique facts and circumstances that surround [a] particular bankruptcy." *In re Long*, 322 F.3d at 554–555.

The Debtor submitted her household's monthly budget as the first page of Plaintiff's Exhibit 4. She did not testify on it in detail.[29] All told, and with the deletion of one line-item that was no longer expended by the time of trial, the total of the monthly household expenses identified by the Debtor is $5,913.00.[30]

In response to the Debtor's case on expenses, ECMC and Sallie Mae took exception with only two of the line-entries on the Walkers' budget.[31] Both of them are payments on debt incurred for purchases made after the Walkers moved to Hudson, and after the Debtor received a discharge in bankruptcy. Troy Walker is contractually bound to both of these payment obligations; assets of their marriage are pledged to secure the associated liabilities;

---

**29.** This page was actually an excerpt from the Debtor's answers to ECMC's pretrial interrogatory no. 16. The budget is set forth in line-item format with the nature, frequency, and average amount of each category of expense.

**30.** The expense no longer relevant is the "Technical school tuition" for the Debtor's curtailed and now-terminated study of nursing.

**31.** Hence, it is not necessary to make a finding of fact that laboriously recapitulates every other line-entry in the budget presented. Admittedly, this goes against the customary style of judicial fact-finding under § 523(a)(8), which entails compulsively-minute detail. For the purposes of any post-decision review, the unchallenged content of the Debtor's budget in Plaintiff's Exhibit 4 is adopted by reference, as a finding. On an independent review, none of the unchallenged line-entries is excessive or unusual in nature, in the regional economy and against the needs of the Debtor's family.

and the Debtor apparently is not personally liable on either.

The first is a component of the line-entry total for "Mortgage." The component is in the amount of $373.52, payable monthly on a debt secured by a second mortgage against the Walkers' homestead.[32] The original amount of this loan was $50,000.00. Troy Walker took it out in the fall of 2005, using the majority of the proceeds to build a screened-in, 16-foot by 22-foot deck off their house. This was about a year and a half after the Walkers purchased the Hudson property.

The second is a monthly payment in the stated amount of $850.00, on financing for Troy's acquisition of the 2007 Chevrolet Suburban. He purchased this vehicle new, off the lot, for approximately $40,000.00.

Counsel for ECMC and Sallie Mae made much of the alleged extravagance in the nature of the purchases linked to these payments. Their argument was rhetorical, at times almost priggish. The purchase of the deck was characterized as "showing her household has money for whatever purposes they see fit." The acquisition of the Suburban was tagged as "inexcusable when it comes to the minimal lifestyle undue hardship standard," with "all this go[ing] far beyond what's necessary." [33]

In the first place, one has to wonder about the point of this attack, as it would apply toward a practical outcome, in context and against the totality of the Debtor's present circumstances. Is the Defendants' expectation that the Debtor somehow prevail on her husband—an independent economic actor with his own power of choice—to satisfy these liabilities in some way, freeing up a corresponding amount from the household's cash flow in order to make payments on her educational-loan debt?

As to the home-related debt, that notion is complete fantasy. Under the Walkers' circumstances, there does not seem to be a way at present for them to pay off this debt without forcing the sale of the family home. That measure would not relieve them of the de facto need to house themselves and their five children by some other means, which would involve significant expense anyway; this is not a small family in today's terms.[34] If the argument is not directed toward an elimination of this debt, then the Defendants' position has nothing more than a hard-bitten punition at heart—"Well, they shouldn't have taken on this other debt, so they should be forced to find the money elsewhere in order to pay us."

---

**32.** Sallie Mae and ECMC do not question the reasonableness or necessity of the rest of the Walkers' monthly expenditure for mortgage payments. As of March, 2007, they were paying $1,598.90 per month on a debt secured by a first mortgage, related to their purchase of the house.

**33.** Much was made in argument and interrogation of the fact that the Suburban's features included leather seats and a DVD player. The Debtor testified, without challenge, that when she and Troy went looking for a vehicle large enough to fit all the children safely, she did Internet research on local dealers; that she concluded it would be less expensive to buy off the lot than to special-order; that they

chose the least expensive Suburban on the lot of the dealer they chose; that all other Suburbans on the lot featured leather and DVD players; and that the dealer would not take their proffer of one of their other vehicles for a trade-in.

**34.** It also takes no account of the serious disruption that such a dislocation would bring to the children's lives. The Debtor testified to how her two sons with autism had great difficulty dealing with unexpected change in their immediate environment. This is entirely consistent with their diagnosis. *See supra* note 15.

Some judicial pronouncements in application of § 523(a)(8) adopt a comparable, personally judgmental, and ultimately punitive tone. That would be wholly inappropriate here. A like amount could not be extracted from the balance of the Walkers' household cash flow without jeopardizing the stability of all of the children's upbringing, and probably interrupting the treatment and socialization of the sons with autism.[35]

And, in any event, the Defendants ignore the fact that this matter involves a still-functioning marriage, but one that is under stress from the combination of a difficult, intractable affliction and the overhang of massive debt.[36] The Walkers, parents of five young children, have already experienced real discord over the subject matter of this litigation. The Debtor testified, spontaneously (even emotionally) and credibly, that she and Troy had already broached the possibility of divorce, and that he had isolated her from asset ownership (the vehicles) and charging ability on revolving credit. One can speculate all one wants about the dynamics within the Debtor's marriage, and the residual strength or weakness of that bond; but the record unequivocally reflects a real, substantial, and undeniable chance of family breakup, with a likely loss of the home that the Walkers' children have had, if the Debtor's educational loan obligations are not resolved in some way. It would be inaccurate and disrespectful to characterize the Debtor's testimony to that effect as self-serving or contrived.

Whether the Defendants' administrators care to acknowledge it from their distanced institutional perspective or not, the considerations here impinge on a fragile and sensitive spousal relationship, stretched from large external pressures that are traced to only one of the partners. That necessarily has caused an imbalance, which has obviously led to resentment; one party, Troy, could very easily choose to exit the marriage, which in turn would implicate the well-being of five young and vulnerable children. The unspoken subtext of the Defendants' insinuations is that it is possible to structure a result on dischargeability to sanction the Debtor for the incurring of these two debts, and nonetheless contain the financial consequences to impact her alone. They do not describe how that could be done; and frankly, it cannot be envisioned. The thrust of the Defendants' position here ignores the reality of seven people's lives, in a way that borders on being demeaning.

That is all a matter of the *consequences* of the Defendants' position in opposition to the mere presence of these expenditures in the household budget. On balance, their objections do not prevail on the plane of immediate *function* either, i.e., measured in terms of the necessity and reasonableness of these expenses.

---

**35.** The Walkers' family budget includes a line-item of $350.00 for "Special services copays" for their sons with autism. The Debtor testified that, at the time she prepared the budget, this was the amount they were paying monthly on several thousand dollars' worth of accumulated WEAP-related charges that were not covered by insurance or the Wisconsin state subsidy. She expected to pay the then accumulated balances off in two years or so. Presumably, copays will continue to accrue as the boys receive ongoing services from WEAP.

**36.** The literature is replete with studies on the financial and emotional challenges borne by the parents and siblings of children with autism. *E.g.*, Michael D. Kogan et al, *A National Profile of the Health Care Experiences and Family Impact of Autism Spectrum Disorder Among Children in the United States, 2005–2006*, 122 PEDIATRICS 1149, 1153 (2007); Scott M. Myers et al., *Management of Children with Autism Spectrum Disorders*, 120 PEDIATRICS 1162, 1174 (2007), and studies cited therein.

This frame of reference is, of course, more directly responsive to the prescriptions of the Eighth Circuit precedent. *Andrews* and *Long* require a given debtor's expenditures to be compared to an objective measure. The debtor's actual consumption patterns are held in check by a standard that imposes relative modesty: what is necessary to maintain a safe and stable environment for a debtor and the debtor's dependents, without significant expenditure on things that are not necessary to that end. And certainly, any indulgence in luxury is to be eschewed. But nonetheless, in applying that thought, the Eighth Circuit's "totality" approach expressly requires the unique circumstances and needs of the debtor and the debtor's dependents to be considered. This includes any circumstances arising from individual household members' medical or psychological conditions. *In re Reynolds,* 425 F.3d at 533.

In this light, the Defendants missed the point in their insistence that the two challenged expenditures are unreasonable and unnecessary. In isolation and in the abstract, yes, anyone should look askance, if the question were whether a modest or "minimal" standard of living would include the presence of such expenditures. Considering the question prospectively—in terms of whether a person in financial straits should now make such an acquisition, with the attendant assumption of debt—virtually presupposes an answer in the negative.

But that is not the situation here and now. Before the commencement of this adversary proceeding, the Debtor's husband had already bound himself to this debt service, by contracting for the purchases and financing them. At the time he did so he was the sole provider of income; and apparently he thought he had the prerogative to do what he did. But this necessarily imposed the payment on the debt on the household budget. The Debtor was not a named borrower on the underlying indebtedness.[37] It is not clear how active she was in the election to go forward on the purchases, or how much she acquiesced in purchases for which her husband was the initial or main advocate.[38]

What is clear *at present,* however, with the household already bound into debtor status in both secured transactions, is that the fruits of the purchases do serve real functions promoting the well-being of the Debtor's family, as it is presently constituted. In the unique posture of that family, the presence of the deck and the Suburban do not hold the character of luxuries offensive to the *Andrews/Long* test. So neither expenditure fails muster under the "reasonableness" and "necessity" criteria of the second factor.

The reasons are several-fold, and they go back to two core circumstances.

First, the sole wage earner in the household, Troy, holds a job in the protection of the public's safety; he needs utterly reliable transportation for a commute of a minimum of 25 miles one-way. He com-

---

37. The reason is not crystal-clear from the record, but it seems to have been because she lacked creditworthiness due to the unpaid status of her educational-loan liabilities.

38. On redirect examination, the Debtor stated that she didn't "feel [she could] say anything about the use of the money" that her husband earned, when she was not working outside the household herself. Anyone who has been married knows the multiple and potentially dense ambiguities of the decision-making process as to any major financial commitment, as between parties to the marriage. In these days and times the parties' individual functions as income-earners very much play into the dynamics of any marriage relationship, further breeding such ambiguities.

mutes to several alternate work places, on as many as seven days per week and at varying times day or night. If the Suburban does not stand to serve that function on his every workday, because the Debtor may need it to transport all the children at once, then one of the two remaining vehicles in the household necessarily serves as a backup. The Suburban model is tested by long-time presence in the market, and this unit is relatively new; thus, it should be a reliable form of transportation for the Walkers for significantly longer than it will take to pay off the associated debt. To the extent that the Debtor uses the Suburban for household purposes, its size and durability promote safety for the five children of this family. This family's logistical needs must accommodate more than double the average number of children in an American family unit. To be sure, there are other vehicles that could provide safety and reliability, even for this number of children, and at least some of them could have been had for less than the acquisition cost of the Suburban. But this particular vehicle promises to be very durable. As a long-term investment, to be used for the bulk of the children's years of minority, it is at least as defensible as the purchase of a succession of lower-cost larger vehicles like minivans or large sedans, new or used. With a new-car warranty to lessen the brunt of repair expenses in early years, it probably outcompetes the notion of purchasing used, comparable vehicles at significantly lower unit-cost, but with the assumption of materially higher risk of defects and repair expenses.[39]

**39.** And at this point, sacrificing the Suburban to a sale would most likely not help the Walkers; with the used-car market currently flooded with inventory, prices are low, and the most likely result would be a surviving deficiency obligation to the lender.

The cut on the issue of the necessity and reasonableness of the Suburban's cost is not unequivocally or even heavily in the Debtor's favor; but the defensibility of the purchase and the value of the vehicle's current presence are high enough that the Debtor's case for keeping it and paying for it preponderates.

The inquiry as to the deck involves considerations that are not as concrete. However, the Debtor prevails as well as to the necessity and reasonableness of this line-item.

In her testimony as to everyday life, week-in and week-out, the Debtor depicted a family that was largely "confined to quarters" in and around its dwelling place. That is imposed by the Walkers' straitened financial means, and by the psychological condition of two of its young members. The Debtor testified that she and Troy had been able to afford only one family vacation with all five children since 2004, a trip driving in the van to Florida in 2004 or 2005. The Debtor described the experience as "a nightmare" due to the crowding (and likely due to behavioral difficulties from having her sons with autism outside their usual environment). Without challenge from the Defendants, the Debtor attested to never having taken another family vacation trip; to never going out with the children to eat or to attend a movie (understandably, the Walkers cannot "easily navigate" with two sons with autism); and to essentially staying put at home, using their cable television service to entertain the children and themselves.[40]

**40.** Two side-points are clear from the record. The Walkers cannot afford to take their family out for a meal or entertainment anyway. And, the cable television service is a necessity in context, of benefit to the children as education and entertainment both—however much it is not directly related to any basic life function.

With those as the undeniable and unavoidable limits on the scope of family time together, the construction of a screened deck is defensible as reasonable. The improvement significantly expanded the usable space of the Walkers' dwelling for six-plus months per year, giving the children a play space with fresh air during mosquito season. The useful life of the deck will last for the children's presence in the Debtor's household; its acquisition will have the same justification for years to come. So, again, the Debtor has made an adequate case for having and paying for this item, as a reasonable expenditure that serves a real function in the unique circumstances of their family.

The consequence of these conclusions is that the presence of these actual, current expenditures in the Debtor's household budget is not to be disregarded. This means that the present total of the Debtor's reasonable and necessary household living expenses is $5,913.00.

In 2004, of course, the Walkers did not have either of the two challenged payments on a monthly basis (though they did have the payment on the primary mortgage against the house that they had just bought). However, there is no basis in the record to extract any of the other line-entries for expenses from their 2007 budget, as it would apply to 2004, or to reduce any particular expense amount, other than possibly the "Special services copays" for therapy related to their sons' autism. The total of the payments on debt related to the Suburban and the deck is $1,223.52; and the "Special services copays" are noted at $350.00 per month. Assuming (for the sake of argument) that those copays were not an actual expenditure for the

Walkers then, taking these three expenses out would result in a total of costs for household necessities of $4,339.48, as of mid-2004.

### 3. The Debtor's Income–Derived Means to Make Payment on her Educational–Loan Debt

The total of the living expenses for the Debtor's household exceeds the current net income for the household. Thus, there were no income-generated resources available to the Debtor as of the date of trial, from which she could make payment to the Defendants. The same situation prevailed in mid-2004, as of the date of the Debtor's receipt of discharge.[41] As of both dates, a reasonable level of deemed expenditure on household necessities exceeded the actual income inflow to this house. Undoubtedly this family was, and is, shuffling around various payments, constantly deferring various expenses and purchases to fit within its limited means.

And on the evidence of record, it was and is not reasonably foreseeable that the Debtor's household will generate an income surplus at a meaningful future date, in an amount sufficient to make a payment of any magnitude to the Defendants either.

To expand on that: there is no direct evidence in the record to support a finding that any of this family's relevant circumstances will change in the coming years. Every inference to be drawn from the evidence is that they will not. For the two-year balance of her sons' participation in the intensive phase of WEAP, the Debtor will have to remain close to home. At this point, it is unknowable as to how the therapy will affect her sons' ultimate ability to function in a societal environment, independently, interactively, and in a more

41. So much for ECMC's assertion of prejudicial delay on the Debtor's part. True, it would have been neater and more consonant with the Eighth Circuit's rulings had the Debtor sought her relief under § 523(a)(8) three years earlier; and she and her counsel never even proffered an excuse why they waited. But in the end, the bottom line of her case for dischargeability is the same, whichever year is used.

typical fashion. So even as the Debtor's other children mature and become more self-sustaining, the great odds are that she will have a significant demand on her attention as long as her sons with autism are below the age of majority and in her household. Practically speaking, her sons' condition is likely to keep her tied to them and the family home, limiting her to part-time employment at most. Her credential to be a school psychologist will continue to age, even as the university systems churn out hundreds of competitors with fresher degrees and more recent and relevant experience. The only employment prospect for the Debtor of ready availability would be low-wage employment, in the retail or service sector, of the sort she held at Walgreens and Wal–Mart. Jobs of that sort did not serve the Debtor or her family at all on the occasions where she resorted to them to increase the household's income.

The record cannot support a finding that the income-generating capacity of the Debtor's household will materially increase in the reasonably-foreseeable future, so as to produce a reliable income surplus. The only inferences to be drawn from the sparse evidence of record are entirely to the contrary: things will not change materially for the better, toward financial means that could be directed to pay down the ever-burgeoning amount of her debt to the Defendants, according to the amortizations of the full amount that the Defendants have presented in their evidence.[42]

#### 4. Other Relevant Facts and Circumstances

Other aspects of the Debtor's life-situation and debt structure bear on the undue hardship inquiry.

The reported decisions under § 523(a)(8) frequently mention the debtor's past effort toward payment on the debt in question; many find it especially significant if it seemed that the debtor had even made an effort. *E.g., In re Gitsch,* 384 B.R. 555, 558–559 (Bankr.N.D.Iowa 2008); *In re May,* 368 B.R. 850, 860 (Bankr.D.Neb. 2007); *In re Nelson,* 343 B.R. 919, 924 (Bankr.S.D.Iowa 2006); *In re Shadwick,* 341 B.R. 6, 14 (Bankr.W.D.Mo.2006). Too many courts dwell on this point in a somewhat morbid fashion, particularly where the debtor's past conduct was less than diligent. In both its punitive aspect and its retrospective orientation, this emphasis does not resonate well with the orientation of *Andrews* and *Long,* toward the debtor's *present and future* prospects.

For what it is worth, however, the Debtor here cannot be held to task on this point. Before she and Troy moved to Minnesota, the Debtor made at least sporadic, small payments on the debts now held by the Defendants.[43] After arriving in Minneapolis, the Debtor was only sporadically employed; she was into the process of family formation; and she clearly lacked any means to make payment. So, she took advantage of administratively-granted deferment and forbearance relief from the lenders, for as long as she could. In all this, she was responsive enough to her obligation of payment. She cannot be tagged with a cavalier attitude toward the repayment programs that the Defendants administer, and it cannot be found that she shirked her responsibilities under them.

When the Debtor filed for bankruptcy, her obligations on educational loans were

---

**42.** The daily interest accrual on the claims of ECMC alone is $42.97—about 50% more than the Walkers spend daily on groceries for their family.

**43.** The record does not reflect the historical minutiae, but the fact of her having made some payments is established by testimony, exhibit, or admission by counsel for one or both Defendants.

the great majority of her debt structure—95% of the amount of scheduled unsecured claims, in fact.[44] Obviously, the Debtor contemplated the discharge of her educational-loan debt when she filed; and at the time it was clear that receiving that relief would give her the greatest benefit from a bankruptcy filing.

■ Many courts have groused about debtors whose principal motivation in filing for bankruptcy appeared to have been the discharge of educational-loan debt. *E.g., In re Rouse*, 2008 WL 4153678, at *6 (Bankr.D.N.D.2008); *In re Poe*, 354 B.R. 265, 272 (Bankr.W.D.Mo.2006). However, there is no badge of bad faith in seeking the fresh start of bankruptcy against such claims, where the debtor has made some effort to satisfy them before filing, and has a colorable case on undue hardship. *In re Halverson*, 401 B.R. at 388–389. *Cf., In re Lee*, 345 B.R. 911, 918 (Bankr.W.D.Ark. 2006), *aff'd*, 352 B.R. 91 (8th Cir. BAP 2006) (inferring that discharging educational loans was "dominant purpose of the bankruptcy filing" where debt on such loans was 76% of amount of scheduled unsecured claims; but apportioning little weight to that point, where record contained no evidence that debtor had funded education via loans with intent to later discharge debt in bankruptcy). On that thought, the prominence of the Defendants' claims in the Debtor's debt structure, and the prospect of discharging them as a significant motivation for her bankruptcy filing, do not diminish her showing of undue hardship.

■ ECMC brought out one other circumstance oriented toward the Debtor's past acts and conduct, but only late in the process. In cross-examining the Debtor, its counsel got her to acknowledge that she had borne all of her children "after [she] took out the student loans," and that she had understood at those times that she owed the associated debt. He then asked her if her children had been "planned"; to which she responded, curtly, that she was of the Roman Catholic faith. Counsel then dropped the subject until closing argument.[45] At that time, referring to "her religious choice," ECMC's counsel abjured that "you have to make the decision to have a family in light of what you can afford . . ."

Couched in nebulous verbiage but made in bombastic tone, this argument is audacious. But it is nothing else. In the abstract sense, this point again goes to past fact, contrary to the prospective thrust of the *Andrews/Long* standard. On its merits, ECMC never frames a palatable rationale under which the issue could turn the outcome, or one to give it any weight at all. And ECMC does not even acknowledge that denying the Debtor discharge of these debts on the basis of her life choices would rebound right back on her five children, whose interests are inescapably intertwined with the considerations.[46]

---

44. The Debtor scheduled only four unsecured debts. Two were on credit card accounts; the other two are now held by the Defendants. The total of the scheduled debt on credit card accounts was $10,313.00; the total on educational-loan obligations was then $191,663.00.

45. One wonders why the timing of family formation was absent from the facts and circumstances treated in ECMC's trial brief. If this was a proper factor to push before the Court, the Debtor and her counsel had the right to know about it before trial was convened; and ECMC should have had the forthrightness to put it into the record in writing, up front.

46. And, as noted *supra* pp. 858–59, ECMC has not outlined a way in which a judgment favorable to it and penalizing the Debtor individually could be structured to avoid hardship to the children.

And finally, buying into ECMC's argument, no matter how it is applied, would invade individual prerogatives of religious practice and fundamental life-choice, to a degree that would exceed the judiciary's limited role in a free, open, and voluntaristic society. The Debtor and her husband have brought five human lives into existence; and though it has not been without struggle, they are nurturing them in a safe, intact, two-parent family. ECMC is beyond the pale in demanding that the Court turn its decision against the Debtor, based on her past choices in that regard.

As it seems to do in defending all adversary proceedings under § 523(a)(8), ECMC falls back on the availability to the Debtor of participation in the Income Contingent Repayment Program ("ICRP") for financially-distressed borrowers on educational loans.[47] Under this program, borrowers who consolidate their educational-loan debt may qualify for the reduction of their current obligation of payment to an amount that is capped in a ratio to their current income, 34 C.F.R. § 685.209(a)(2), and readjusted on an annual basis, 34 C.F.R. § 685.209(a)(5). Interest continues to accrue on the debt during a repayment period of up to 25 years. 34 C.F.R. § 685.209(c)(5) and (c)(4)(i). The Secretary of Education "cancels" the unpaid balance on the accrued debt at the end of the repayment period if the borrower has maintained all requirements for participation throughout. 34 C.F.R. § 685.209(c)(4)(iv).

The parties have stipulated that the Debtor's loans held by ECMC are eligible to participate in the ICRP. They also stipulate that, calculated on the basis of her household income and family composition in 2007, the Debtor's restructured monthly payment on account of her debt to ECMC would be $593.98. The Debtor has not enrolled in the ICRP.

ECMC asserts that "[t]he ICRP is a reasonable alternative" for the Debtor, at that payment amount. As ECMC would have it, the Debtor's eligibility for participation in the ICRP defeats the Debtor's showing of undue hardship, and essentially mandates judgment in ECMC's favor.

There are at least two reasons why this argument has no merit at all, one legal and one factual.

First, as held repeatedly in local case law, a current eligibility for the ICRP is not determinative of the issue of undue hardship under § 523(a)(8); it is only one factor in the totality of the circumstances. *In re Lee,* 352 B.R. at 96–97; *In re Cumberworth,* 347 B.R. at 661; *In re Long,* 271 B.R. 322, 332 (8th Cir. BAP 2002), *rev'd on other grounds,* 322 F.3d 549, *on remand,* 292 B.R. 635 (8th Cir. BAP 2003); *In re Ford,* 269 B.R. 673, 677 (8th Cir. BAP 2001); *In re Brooks,* 406 B.R. 382, 395 (Bankr.D.Minn.2009); *In re Halverson,* 401 B.R. at 389–390; *In re Korhonen,* 296 B.R. 492, 496 (Bankr.D.Minn.2003). The reasons why it is not determinative are many, and they are discussed at length in these decisions. The most illuminating one is that the ICRP *presumes* that an educational-loan borrower has the ability to pay the amount identified by the regulation's calculus, as applied to adjusted gross income. On the other hand, the undue hardship inquiry in bankruptcy requires the court to make a case-specific factual finding on the basis of evidence, as to the debtor's *actual* ability to pay. *In re Lee,* 352 B.R. at 95. Bankruptcy law affords the rule of decision in the dischargeability

---

**47.** Participation in the ICRP is made available through the William D. Ford Federal Direct Loan Program administered by the United States Department of Education; it is authorized under 20 U.S.C. § 1087(a) and 34 C.F.R. § 685.209 (2007).

context; and its application does not rest on a perfunctory, abstract process of deeming based on mathematics alone.

■ And that segues over into the factual reason why ECMC's ICRP-based argument is spurious. ECMC proffers only one linkage into real-life ability to pay: the payments on Troy's indebtedness for the Suburban purchase and the deck addition "*could have* been used to pay off some of [the Debtor's] Student Loans ...,"[48] By the date of trial, no party here was dealing in such conjectures. The Debtor's household was already committed to these expenditures, contractually or functionally. Between the practical improbability of extrication from the commitments and the case for their necessity, these expenditures had to be accepted as actual, current, and relatively long-term obligations that drew the household's current income below a break-even point. The total of the two ($1,183.52) is less than the gap between income and reasonable and necessary expenses ($1,453.00) anyway.

ECMC's alternate contention, that "the 2007 tax refunds ... could be used to fund more than one year's worth of ICRP payments," similarly lacks perceptiveness. When the cycle of income tax over-withholding and tax refunds is taken out of the calculation of average monthly income, the annual receipt of this purported largess is no longer relevant to the determination of actual means for payment.[49]

And with those three points neutralized, it is clear that the Debtor has, and will have, no means to pay any portion of an ICRP-based payment to ECMC. Denying discharge of ECMC's claim would impose

undue hardship on her and her children, even if she were to go through the motions of qualifying for the program. *Cf.*, *In re Long*, 292 B.R. at 638–639 (on remand; holding as matter of law that debtor's demonstrated, de facto ability to make ICRP-determined payment of $54.00 per month to creditor on educational-loan debt defeats her case for undue hardship).

■ One other fact-based circumstance cuts in favor of the Debtor, even though it cannot be determinative. The Debtor testified, simply but emotionally and convincingly, that the long overhang of her huge educational-loan liability had become a significant irritant in her marriage relationship, to the point where she or her husband had posited divorce as an alternative if she did not get the debt resolved. Troy did not appear for testimony, so there is no way to divine his side of this matter. In the end, it is no judgment on the sincerity or credibility of the Debtor to say that this possible chain of effect does not determine the existence of undue hardship. As a matter of judicial policy, the ambiguities of any marital relationship, and the possibility of self-serving posturing or even collusion in any particular case, disfavor that.

But it cannot be gainsaid that the Debtor, her marriage bond to Troy, and her five vulnerable young children would be in a much better, safer, and more stable place without the large distraction that the liability imposes on her. The outcome of this adversary proceeding does not implicate the future of only the Debtor; the interests of her children are very much at stake in the outcome here. The children would be markedly more at risk if their

---

48. The emphasis is added.

49. It appears that the Walkers' annual receipt of tax refunds merely functions to let them catch up on accumulated short-term debt for household expenses, which undoubtedly accrues as a result of the ongoing monthly shortfall. Troy's functional over-withholding is an inefficient form of forced savings; it is not at all a windfall-for-the-wasting, as ECMC self-righteously characterizes it.

mother were under the stress of coping with payment responsibility, all-too-likely spousal recrimination, and the fear of continuing collection pressure, litigation, and attempted enforcement of judgments.

The text of § 523(a)(8) expressly makes the interests of a debtor's dependents relevant to the issue of undue hardship. On the Debtor's unrebutted testimony, all one can say is that she, her marriage, and her children will all have a better chance at survival in an intact state, and with emotional health and stability, were she relieved of this debt. And though it does not drive or even turn the result, that observation is entirely consistent with the conclusion that it would impose an undue hardship in the financial sense, to allow the statute's exception to operate automatically.

One last observation, which does not go directly to the third consideration under *Andrews* and *Long,* but which buttresses the conclusion made inescapable by all of the analysis.

The historical facts here are an exemplar of an American archetype: a young person born in circumstances of relative want, but recognized as possessing ability and intellect, sought to better her station in life and to rise economically through a bid to enter a respected profession. Her chosen route was through higher education, very much in the modern American way. The limited financial means of her background required her to fund her pursuit through educational loans. But then her bid for the specific advancement failed. That left her burdened with heavy debt, but unblessed by a professional credential

to enable its repayment.[50] The amount of the debt was far beyond her ability to pay, in the personal circumstances that had mounted over time despite her patient efforts to ameliorate her failure. So she was forced to resort to bankruptcy—the safety valve of an economy oriented around entrepreneurship and risk-taking, an expedient that also is fully resonant with the American grain.

In that light, the Debtor's bid for relief from her debts to the Defendants is entirely consistent with the socioeconomic function of the debtor's remedy of discharge under modern American bankruptcy law: relieving the "honest but unfortunate" from the financial consequences of risk undertaken in economic entrepreneurship, that did not play out to the best results. *Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–555, 35 S.Ct. 289, 59 L.Ed. 713 (1915). *See also* Nicholas L. Georgakopoulos, *Bankruptcy Law for Productivity,* 37 WAKE FOREST L.REV. 51, 58–59 (2002); Anthony T. Kronman, *Paternalism and the Law of Contracts,* 92 YALE L.J. 763, 785–786 (1983). In the framing of the first permanent federal bankruptcy law, the remedy was seen as a means by which aggressive and imaginative economic risk-takers could obtain the now-proverbial "fresh start," a means to free them (however chastened) to put their energies back to personal betterment, and to promote more general economic growth. Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge,* 65 AM. BANKR.L.J. 325, 364–365 (1991).[51]

---

**50.** This alone materially distinguishes the Debtor's experience from the anecdotal, perhaps apocryphal "evidence" that prompted Congress to enact the predecessor to § 523(a)(8). *See* historical summary in *In re Johnson,* 218 B.R. 449 (8th Cir. BAP 1998).

**51.** Professor Tabb quotes the legislative history to the Bankruptcy Act of 1898, in which Congress acknowledged that the recreation of a federal remedy for discharge of indebtedness would "restore to the business and commercial circles of the country the active and aggressive elements that have met with mis-

The Debtor here had something in common with the idealized beneficiary of those early legal policies. She too had big dreams; she responsibly put herself to hard work through study, and took the large risk of levering the cost of an upward leap in life-station. That years-long endeavor did not end up the way she wanted. Her further efforts, toward alternate careers of respect and standing, were stymied by unanticipated external circumstances and limitations imposed by her other life-choices. At this time, she is doing the best she can to be a devoted and attentive mother, in an intact marriage of two parents.

Given her intelligence, courage, and energy, the future will hold something for the Debtor in a profession. But that will not be for years to come, due to the family responsibilities she recognizes and bears. The true shape of her future is unknowable. In the meantime, it does no damage to the congressional policies behind § 523(a)(8) to give her a fresh start from the massive burden of that past, now-failed undertaking. And that result is entirely consonant with the purposes of the legislation that created the bankruptcy law that applies here.

### CONCLUSION

It would be an undue hardship to except the Debtor's debts to ECMC and Sallie Mae from the discharge under Chapter 7 that she has already received.

### ORDER FOR JUDGMENT

Based on the foregoing memorandum of decision,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. Excepting the Plaintiff's debts to the Defendants from discharge in bankruptcy would impose an undue hardship on the Plaintiff and her dependents.

2. As a result, those debts were subject to discharge in BKY 04–32012, and were discharged in the due course of that case.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

fortune and are now practically disabled for the battle of life ..." 65 Am. Bankr.L.J. at 635, n. 321 (quoting H.R.Rep. No. 65, 55th Cong.2d Sess. 30–32 (1897)). *See also Local Loan Co. v. Hunt,* 292 U.S. 234, 245, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (characterizing, generally, "the purpose of the Bankruptcy Act to afford the emancipated debtor" a "new opportunity in life and the clear field for future effort ...").